**ORAL ARGUMENT NOT YET SCHEDULED**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**Nos. 20-1283 and 20-1352 (consolidated)**

**New York Power Authority and
Hudson Transmission Partners, LLC,**

*Petitioners,*

**v.**

**Federal Energy Regulatory Commission,**

*Respondent.*

**On Petitions for Review of Orders of the
Federal Energy Regulatory Commission**

### PETITIONERS' JOINT OPENING BRIEF

Gary D. Levenson,
Principal Attorney
New York Power Authority
123 Main Street
White Plains, NY 10601
(518) 433-8700
Gary.Levenson@nypa.gov

Lawrence G. Acker
Gary D. Bachman
Van Ness Feldman, LLP
1050 Thomas Jefferson St. NW
Washington DC 20007
(202) 298-1800
lga@vnf.com
gdb@vnf.com

*Counsel for New York Power Authority*

William R. Hollaway, Ph.D.
Lucas C. Townsend.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave, NW
Washington, DC 20036
(202) 955-8592
whollaway@gibsondunn.com
ltownsend@gibsondunn.com

*Counsel for Hudson Transmission
Partners, LLC*

Dated: February 17, 2023

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners, through their undersigned counsel of record, make the following disclosures:

1.    New York Power Authority ("NYPA") is an instrumentality and a political subdivision of the State of New York, organized under the laws of the State of New York, and operating pursuant to Title I of Article 5 of the New York Public Authorities Law.  NYPA generates, transmits, and sells electric power, principally at wholesale.  NYPA's customers include various public corporations located within the metropolitan area of New York City, as well as businesses and municipal and rural electric cooperative customers located throughout the State of New York.  NYPA is also a transmission owner member of the New York Independent System Operator, Inc.  Since January 2017, NYPA has operated the New York Canal Corporation, a public authority governed by the New York Public Authorities Law, as a subsidiary.  NYPA has no other companies, subsidiaries, or affiliates.

2.    Petitioner Hudson Transmission Partners, LLC ("Hudson") developed and constructed, and owns and operates, the Hudson Transmission Project—an approximately eight-mile underground and underwater electric transmission facility that runs from northern New Jersey to New York City.  APG Asset Management and California State Teachers Retirement System each indirectly have a 10% or more

ii

ownership interest in Hudson through an investment managed by Argo Infrastructure

Partners. No other company has a 10% or more ownership interest in Hudson.

*/s/ William R. Hollaway, Ph.D.*
William R. Hollaway, Ph.D.
GIBSON, DUNN & CRUTCHER,
LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8592
whollaway@gibsondunn.com

*Counsel for Hudson Transmission Partners, LLC*

*/s/ Lawrence G. Acker*
Lawrence G. Acker
VAN NESS FELDMAN LLP
1050 Thomas Jefferson St. NW
Washington DC
(202) 298- 1800
lga@ vnf.com

*Counsel for the New York Power Authority*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel of record for Petitioners certify the following:

### A.    Parties, Intervenors, and *Amici*

#### 1.    <u>Parties Before the Court</u>

The Petitioners before the Court in Nos. 20-1283 and 20-1352 are New York Power Authority ("NYPA") and Hudson Transmission Partners, LLC ("Hudson"). The Respondent is the Federal Energy Regulatory Commission ("Commission"). On September 30, 2020, this Court issued an order consolidating Case Nos. 20-1283 and 20-1352.

The following parties have moved to intervene in Case Nos. 20-1283 and 20-1352:

- PJM Interconnection, L.L.C.
- PPL Electric Utilities Corporation

There are no *amici curiae*.

#### 2.    <u>Parties Before the Federal Energy Regulatory Commission</u>

The list of entities that follows consists of Petitioners and the parties that appear on the Commission's service lists for the underlying proceedings (Docket No. ER18-680-000):

- American Electric Power Service Corporation
- American Municipal Power, Inc.
- Direct Energy

- Direct Energy Business Marketing, LLC
- Dominion Energy Services, Inc.
- Exelon Corporation
- Federal Energy Regulatory Commission
- FirstEnergy Service Company, on behalf of its affected affiliates
- Hudson Transmission Partners, LLC
- Linden VFT, LLC
- Monitoring Analytics, LLC
- New Jersey Board of Public Utilities
- New York Power Authority
- North Carolina Electric Membership Corporation
- NRG Power Marketing LLC and GenOn Energy Management, LLC
- PJM Interconnection, L.L.C.
- Power Supply Long Island and Long Island Power Authority
- PPL Electric Utilities Corporation
- Public Service Electric and Gas Company
- The Dayton Power and Light Company

**B.    Rulings Under Review.**

In these consolidated appeals, NYPA and Hudson seek review of the

following orders:

*PJM Interconnection, L.L.C.*, FERC Docket No. ER18-680-000, Order on Compliance Filing, 170 FERC ¶ 61,295 (Mar. 31, 2020) (R.65; J.A. ___-___);

*PJM Interconnection, L.L.C.*, FERC Docket No. ER18-680-002, Order Granting Rehearing for Further Consideration (not reported) (June 1, 2020) (a tolling order) (R.70; J.A. ___);

*PJM Interconnection, L.L.C.*, FERC Docket No. ER18-680-002, Order Addressing Arguments Raised on Rehearing and Denying Clarification, 172 FERC ¶ 61,205 (Sept. 3, 2020) (R.74; J.A. ___-___).

## C.    Related Case

Although this appeal previously has not been before this Court or any other court, substantially the same parties have appeared before this Court in *New Jersey Board of Public Utilities v. FERC* (Public Service Electric and Gas Company, *et al.*, intervenors) (D.C. Circuit Nos. 20-1079, 20-1080, and 20-1081), a case that is the factual predicate to the current matter and thus, may be considered related within the meaning of D.C. Circuit Rule 28(a)(1)(C).  *Consol. Edison Co. of N.Y. v. FERC*, 45 F.4th 265 (D.C. Cir. 2022).

*/s/ William R. Hollaway, Ph.D.*
William R. Hollaway, Ph.D.
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8592
whollaway@gibsondunn.com

*Counsel for Hudson Transmission Partners, LLC*

*/s/ Lawrence G. Acker*
Lawrence G. Acker
VAN NESS FELDMAN LLP
1050 Thomas Jefferson St. NW
Washington DC
(202) 298- 1800
lga@ vnf.com

*Counsel for the New York Power Authority*

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. ii

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... iv

TABLE OF CONTENTS................................................................... vii

TABLE OF AUTHORITIES ............................................................ ix

GLOSSARY ............................................................................ xii

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION...................................................6

STATEMENT OF ISSUES .............................................................6

PERTINENT STATUTES AND REGULATIONS .................................7

STATEMENT OF FACTS ..............................................................7

    A.   Allocation of Regional Plan Costs Based on Firm Rights .........................7

    B.   Genesis of the Disputed Costs.....................................12

    C.   Lower Voltage Facilities and Economic Projects ....................14

    D.   The Commission Orders Under Review ................................18

SUMMARY OF ARGUMENT .......................................................20

STANDING .............................................................................23

STANDARD OF REVIEW ...........................................................24

ARGUMENT ..........................................................................25

I.   The Commission Approved Cost Allocations That Violate the Cost-Causation Principle..............................................................................25

    A.   The Commission Did Not Perform a Cost-Causation Analysis..............25

    B.   The Commission's Findings of Deficiencies of Violation-Based Cost Allocation. ................................................................28

II.  The Commission Arbitrarily Departed From Its Longstanding Policy That Cost Allocations for Merchant Facilities Are Based on Firm Rights. .............30

    A.   The Commission's Orders Are Inconsistent With Opinion No. 503. ......30

    B.   The Commission's Orders on Review Are Inconsistent With the December 15 Order Approving Hudson's Surrender of its Firm Rights, and This Court's Decision in *ConEd* Upholding the Commission's Order..................................................................32

C.    The Commission Offered No Reasoned Basis for Departing From Its Longstanding Policy ...................................................................34

III.   The Commission Failed to Enforce the PJM Tariff According to Its Terms. .38

A.    Northeast Grid Reliability Project. ...........................................39

1.    Schedule 12 Unambiguously States That PJM May Not Collect Costs From Merchant Facilities That Relinquish Firm Rights.........40

2.    The Commission's Orders Disregard the PJM Tariff's Unambiguous Text and History. ..............................................42

B.    Economic Projects. ..................................................................48

1.    The Commission Ignored That Costs for Schedule 12(b)(v)(C) Economic Projects May Only Be Allocated to Zones, Not Merchant Facilities.................................................................49

2.    The Commission Had No Reasoned Basis to Treat Merchant Facilities with No Firm Rights As "Load." .....................................52

C.    The Commission Had No Reasoned Basis for Treating Economic Projects Under Schedule 12(b)(v)(C) Like Targeted Market Efficiency Projects Under Schedule 12(b)(xvii) Despite Their Different Tariff Language. ......................................................................54

CONCLUSION .....................................................................................56

ADDENDUM A – PJM Schedule 12 – Appendix – Allocations to Hudson of Violation-Based Method Projects .......................................................... A-1

ADDENDUM B – PJM Schedule 12 – Appendix – Allocations to Hudson of Economic Projects.................................................................................B-1

STATUTORY ADDENDUM ............................................................... S-1

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Consolidated Edison Co. of New York v. FERC*,
45 F.4th 265 (D.C. Cir. 2022) ..................................... 3, 7, 8, 10, 11, 12, 13, 14, 34

*Constellation Mystic Power, LLC v. FERC*,
45 F.4th 1028 (D.C. Cir. 2022) ................................................................ 24

*DHS v. MacLean*,
574 U.S. 383 (2015) ................................................................................ 42

*GE Betz, Inc. v. Zee Co.*,
718 F.3d 615 (7th Cir. 2013) .................................................................. 52

*Emera Maine v. FERC*,
854 F.3d 9 (D.C. Cir. 2017) .................................................................... 24

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ................................................................................ 37

*Hughes v. Talen Energy Marketing, LLC*,
578 U.S. 150 (2016) .................................................................................. 7

*Long Island Power Authority v. FERC*,
27 F.4th 705 (D.C. Cir. 2022) ..................................................... 41, 42, 45

*Midwest ISO Transmission Owners v. FERC*,
373 F.3d 1361 (D.C. Cir. 2004) ....................................................... 24, 26

*Myersville Citizens for a Rural Community, Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015) .............................................................. 24

*National Insulation Transportation Committee v. ICC*,
683 F.2d 533 (D.C. Cir. 1982) ............................................................... 45

*Old Dominion Electric Coop. v. FERC*,
898 F.3d 1254 (D.C. Cir. 2018) ......................................................8, 25, 26

*Public Service Electric & Gas Co. v. FERC*,
989 F.3d 10 (D.C. Cir. 2021) ................................................................... 9

*South Coast Air Quality Management District v. EPA*,
    472 F.3d 882 (D.C. Cir. 2006), *decision clarified on denial of reh'g*,
    489 F.3d 1245 (D.C. Cir. 2007) ...........................................................................50

**ADMINISTRATIVE CASES**

*Consolidated Edison Co. of New York, Inc. v. FERC*,
    155 FERC ¶ 61,088, *reh'g denied*,
    157 FERC ¶ 61,190 (2016), *vacated and remanded*,
    *Consolidated Edison Co. of New York v. FERC*,
    45 F.4th 265 (D.C. Cir. 2022) ................................................................................ 8

*Linden VFT, LLC v. Public Service Electric & Gas Co.*,
    161 FERC ¶ 61,264 (2017), *reh'g denied*,
    170 FERC ¶ 61,023 (2020) ...........................................................................32, 33

*PJM Interconnection, L.L.C.*,
    170 FERC ¶ 61,295, *tolling order granting reh'g* (not reported), *order on reh'g*,
    172 FERC ¶ 61,205 (2020)......................... 10, 16, 17, 18, 19, 20, 31, 32, 35, 36,
                                            39, 41, 42, 43, 48, 50, 51, 53, 54

*PJM Interconnection, L.L.C. v. Public Service Electric & Gas Co.*,
    132 FERC ¶ 61,221 (2010), *order on reh'g*,
    135 FERC ¶ 61,018 (2011), *pet. for review denied sub nom.*,
    *NRG Power Marketing., LLC v. FERC*,
    718 F.3d 947 (D.C. Cir. 2013) ...........................................................................11

*PJM Interconnection, L.L.C.*,
    139 FERC ¶ 61,242 (2012) ...........................................................................43, 47

*PJM Interconnection, L.L.C.*,
    142 FERC ¶ 61,214 (2013), *order on reh'g*,
    147 FERC ¶ 61,128 (2014), *order on reh'g*,
    150 FERC ¶ 61,038, *order on reh'g*,
    151 FERC ¶ 61,250 (2015) ....................................................9, 12, 19, 20, 29, 47

*PJM Interconnection, L.L.C.*,
    142 FERC ¶ 61,074 (2013) ...........................................................................47

*PJM Interconnection, L.L.C.*,
    159 FERC ¶ 62,082 (2017), *reh'g denied*,
    170 FERC ¶ 61,124 (2020) ...........................................................................14, 44

*PJM Interconnection, L.L.C.*,
  Opinion No. 503, 129 FERC ¶ 61,161 (2009), *order on reh'g*,
  Opinion No. 503-A, 139 FERC ¶ 61,243 (2012)................. 5, 10, 11, 26, 27, 30,
                                                                          31, 32, 33, 53

*PJM Interconnection, L.L.C.*,
  161 FERC ¶ 61,262 (2017) ("December 15 Order"), *reh'g denied*,
  170 FERC ¶ 61,021 (2020) .................................................. 11, 14, 27, 32, 33, 34

*PJM Transmission Owners*,
  115 FERC ¶ 61,345 (2006), *reh'g denied*,
  120 FERC ¶ 61,013 (2007) ...............................................................................40

*Transmission Planning and Cost Allocation by Transmission Owning and
  Operating Public Utilities*,
  Order No. 1000, III FERC Stats. & Regs., Regs. Preambles ¶ 31,323 (2011),
  *order on reh'g and clarification*,
  Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*,
  Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *pets. for review denied sub
  nom.*
  *South Carolina Public Service Authority v. FERC*,
  762 F.3d 41 (D.C. Cir. 2014) (*per curiam*) ...........................................8, 12, 26

## STATUTES

5 U.S.C. § 706(2) ...........................................................................................24

5 U.S.C. § 706(2)(E) ......................................................................................24

16 U.S.C. § 824d(a) ......................................................................................25

16 U.S.C. § 825*l*(b) .........................................................................................6

# GLOSSARY

| | |
|---|---|
| C.A. | References to citations in the Courtesy Appendix |
| Commission | Respondent, Federal Energy Regulatory Commission |
| Compliance Filing | PJM Interconnection, L.L.C., Compliance Filing, Docket No. ER18-680-000 (Jan. 19, 2018) (R.2; J.A. ___-___). |
| Compliance Order | *PJM Interconnection L.L.C.*, 170 FERC ¶ 61,295 ("Compliance Order") (R.65; J.A. ___-___), *tolling order granting reh'g* (not reported), *order on reh'g*, 172 FERC ¶ 61,205 (2020). |
| ConEd | Consolidated Edison Company of New York, Inc. |
| *ConEd v. FERC* | *Consolidated Edison Co. of New York v. FERC*, 45 F.4th 265 (2022). |
| December 15 Order | *PJM Interconnection, L.L.C.*, 161 FERC ¶ 61,262 (2017) ("December 15 Order") (C.A. ___-___), *reh'g denied*, 170 FERC ¶ 61,021 (2020). |
| Economic Projects | Three different types of projects identified in Subsection (b)(v) of Schedule 12 of the PJM Tariff – (1) acceleration projects, in Subsection (b)(v)(A); (2) modification projects, in Subsection (b)(v)(B); and (3) new economic constraint projects in Subsection (b)(v)(C). |
| Firm Rights | Firm Transmission Withdrawal Rights |
| Hudson | Petitioner, Hudson Transmission Partners, LLC |
| Hudson Answer to Protest | Motion for Leave to Answer and Answer of Hudson to Protests of PJM TOS and NJBPU, Docket No. ER18-680, (Feb. 26, 2018) (R.27; J.A. ___-___) |
| J.A. | References to citations in the Joint Appendix. |
| Linden | Linden VFT, LLC |
| Merchant Facility | Merchant Transmission Facility |
| Non-Firm Rights | Non-Firm Transmission Withdrawal Rights |
| NYPA | Petitioner, New York Power Authority |

xii

| | |
|---|---|
| NYPA-Hudson Rehearing Request | Request for Clarification and Rehearing of the New York Power Authority and Hudson Transmission Partners, LLC, Docket No. ER18-680-000 (Apr. 30, 2020) (R.67; J.A. ___-___). |
| PJM | PJM Interconnection, L.L.C.  PJM refers to *P*ennsylvania, New *J*ersey, and *M*aryland, the first three states where it operated.  PJM also operates in all or parts of Delaware, Illinois, Indiana, Kentucky, Michigan, North Carolina, Ohio, Tennessee, Virginia, West Virginia, and the District of Columbia. |
| PJM Tariff | PJM Interconnection, L.L.C. Open Access Transmission Tariff, https://www.pjm.com/directory/merged-tariffs/oatt.pdf (last visited Feb. 17, 2023) |
| PJM Transmission Owners | Owners of the transmission facilities whose operations PJM manages. |
| PSEG | Public Service Electric and Gas Company |
| Opinion No. 503 | *PJM Interconnection, L.L.C.*, Opinion No. 503, 129 FERC ¶ 61,161 (2009) (C.A. ___-___), *order on reh'g*, Opinion No. 503-A, 139 FERC ¶ 61,243 (2012) (C.A. ___-___). |
| Order No. 1000 | *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051, III FERC Stats. & Regs., Regs. Preambles ¶ 31,323 (2011), *order on reh'g and clarification*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *pets. for review denied sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) (*per curiam*). |
| PJM Opinion No. 503 Compliance Filing | PJM Interconnection, L.L.C., Opinion No. 503 Compliance Filing, Docket Nos. EL07-57-008, *et al.* (Feb. 19, 2010) (C.A. ___-___). |
| Regional Plan | The PJM Regional Transmission Expansion Plan is the product of an annual planning review by which PJM identifies transmission system additions and improvements needed to ensure reliable operations of the electric system under its operational control. |

| | |
|---|---|
| Rehearing Order | *PJM Interconnection L.L.C.*, Order Addressing Arguments Raised on Rehearing and Denying Clarification, 172 FERC ¶ 61,205 (2020) ("Rehearing Order") (R.74; J.A. ___-___). |
| Schedule 12-Appendix | Grid upgrades cost-allocated using the Violation-based Method are set forth in the PJM Tariff Schedule 12-Appendix. |
| Schedule 12-Appendix A | Grid upgrades cost-allocated using the newer Solution-based Method are set forth in the PJM Tariff Schedule 12-Appendix A. |
| Solution-based Method | A "solution-based" distribution-factor calculation (DFAX) that is used by PJM for the allocation of certain transmission project costs by approximating a measure of flows over new transmission projects constructed or upgraded under the PJM Regional Plan. |
| Tolling Order | *PJM Interconnection, L.L.C.*, Order Granting Reh'g for Further Consideration, Docket No. ER18-680-002 (June 1, 2020) (not reported) ("Tolling Order") (R.70; J.A. ___). |
| Violation-based Method | A "violation-based" distribution-factor (DFAX) calculation that was previously used by PJM for the allocation of certain transmission project costs by approximating the cause of overloads on existing transmission facilities and the need for the new transmission projects constructed under the PJM Regional Plan, and was replaced by the Solution-based Method in 2013. |

## INTRODUCTION

Petitioners seek judicial review of two Federal Energy Regulatory Commission ("Commission") orders that required Petitioners to continue paying at least $136 million in costs for electricity grid upgrades based on rights that Petitioners relinquished years ago precisely to avoid those costs. The Commission's orders violated the principle that cost assessments must be roughly commensurate with benefits, departed from the agency's longstanding policy on cost allocations, and erroneously countermanded the grid operator's interpretation of its own PJM Interconnection, L.L.C. ("PJM") Tariff and the plain text of the PJM Tariff's cost-allocation and cost-collection provisions. The Commission's orders are arbitrary, capricious, and contrary to law, and should be set aside.

Petitioner Hudson Transmission Partners, LLC ("Hudson") owns and operates a Merchant Transmission Facility (a "Merchant Facility") consisting of an underground and underwater electric transmission cable running from northern New Jersey to New York City. Petitioner New York Power Authority ("NYPA") contracts with Hudson for use of the Merchant Facility to supply electricity to New York City. Hudson participates in the electric grid operated by PJM, a regional electricity market that serves thirteen states and the District of Columbia. As a participant in PJM, Hudson receives interconnection service under its contract with PJM and the local power utility, Public Service Electric and Gas Company

("PSEG").  Originally, Hudson's contract provided for a type of electricity service known as Firm Transmission Withdrawal Rights ("Firm Rights").  Acquiring those Firm Rights from PJM cost the project $335 million to pay for PJM grid upgrades and, in return, the grid operator (PJM) was required to plan grid upgrades to accommodate those Firm Rights.  Firm Rights can be involuntarily reduced by PJM ("curtailed") only in limited circumstances.  Maintaining Firm Rights is expensive, because it requires PJM transmission service customers (and Merchant Facilities with Firm Rights) to pay for expensive grid upgrade costs on a monthly basis.  Under longstanding Commission precedent, Merchant Facilities can avoid paying those costs if they give up their Firm Rights and take a lesser form of service known as Non-Firm Transmission Withdrawal Rights ("Non-Firm Rights").  Unlike Firm Rights, PJM does not plan its grid to support these Non-Firm Rights, and the Non-Firm Rights can be curtailed by PJM.

In this case, Hudson did just that.  Before 2017, a number of PJM Merchant Facilities and one transmission customer—including Hudson and Linden VFT, LLC ("Linden" another Merchant Facility)—held Firm Rights, and Consolidated Edison Company of New York, Inc. ("ConEd" a PJM transmission customer) held the equivalent of Firm Rights, with the same cost obligations.  But in response to what they all considered to be exorbitant and dramatically increasing cost assessments for these Firm Rights stemming from PJM grid upgrade projects, all of these entities

terminated their Firm Rights.  First, ConEd allowed its contracts with PJM to expire and thus terminated its service.  PJM then reallocated ConEd's share of then-existing grid upgrade costs to other customers, including Hudson and Linden.  That included a reallocation of $633 million in grid costs to Hudson (and NYPA, which is contractually responsible for Hudson's PJM costs) for one particularly costly project to fix local utility short-circuit problems.  To avoid these new costs (and financial hardship) arising from the Firm Rights, in December 2017 Hudson and Linden gave up their Firm Rights and converted them to only Non-Firm Rights, consistent with longstanding Commission precedent and Commission approval.  Today, PJM no longer plans its system to support Hudson's operation, and its service can be curtailed.

In *Consolidated Edison Co. of New York v. FERC*, 45 F.4th 265 (D.C. Cir. 2022), this Court held that after Hudson and Linden surrendered their Firm Rights, Hudson and Linden were no longer responsible for ongoing cost assignments for PJM grid upgrades calculated using a PJM cost-allocation methodology known as the Solution-based Method.  The Solution-based Method replaced an earlier PJM cost-allocation methodology known as the Violation-based Method, which attempted to assign costs based on which customers caused the need for the new grid upgrade.

In this case, the orders under review concern at least $136 million in legacy grid upgrade costs that PJM allocated to Hudson years ago using the Violation-based Method and Economic Projects methodology. Did Hudson's surrender of its Firm Rights in 2017 relieve it of responsibility to pay those continuing grid upgrade costs, which amount to the collection of approximately $12 million per year, every year, for the next 40 years? PJM thought so. In a 2018 filing, after Hudson surrendered its Firm Rights, PJM filed PJM Tariff revisions to eliminate Hudson's Violation-based Method and Economic Projects cost assessments going forward, just as PJM previously had done for ConEd when it terminated its service. But in March 2020, the Commission rejected PJM's proposed PJM Tariff revisions. Instead, the Commission determined that Hudson must continue paying costs for certain grid upgrade projects indefinitely, even though Hudson no longer held the Firm Rights that had made it responsible for those cost assessments in the first place.

The Commission's determination is wrong on multiple levels. Most fundamentally, the Commission's orders violate the basic cost-causation principle, which states that cost assessments must be roughly commensurate with the benefits derived. Here, Hudson receives no benefit from the Violation-based Method grid upgrade projects whose costs the Commission assigned to Hudson despite its termination of Firm Rights. PJM is not required to plan grid upgrades to support Hudson and Hudson's service can be curtailed—the only basis established by the

Commission for assessing grid upgrade costs to Merchant Facilities in the first place. The Commission's disregard of the cost-causation principle was arbitrary and capricious.

The Commission's orders also violate its own longstanding policy regarding Merchant Facilities, first announced in 2009 in its Opinion No. 503.[1]  In Opinion No. 503, the Commission resolved a dispute over how Merchant Facilities would be treated for purposes of PJM grid upgrade cost assessments.  The Commission ruled that Merchant Facilities could be assessed grid upgrade costs only insofar as they held Firm Rights; but Merchant Facilities could avoid cost assessments by surrendering Firm Rights and taking only Non-Firm Rights.  Hudson (and NYPA) relied on that policy when it surrendered its Firm Rights in 2017, but the Commission arbitrarily departed from it by determining that Hudson still must pay costs for certain grid upgrade projects, despite not holding Firm Rights.  The Commission offered no adequate explanation for its about-face.

Finally, the Commission's orders violate the unambiguous text of the PJM Tariff, which specifies when Merchant Facilities may (and may not) be assessed costs, and when those assessed costs can be collected from Merchant Facilities.  The PJM Tariff is unambiguous that costs for the Violation-based Method projects in

---

[1] *PJM Interconnection, L.L.C.*, Opinion No. 503, 129 FERC ¶ 61,161 (2009) (C.A. ___-___), *order on reh'g*, Opinion No. 503-A, 139 FERC ¶ 61,243 (2012) (C.A. ___-___).

question—described as Lower Voltage Facilities—may only be collected from Merchant Facilities that have actual Firm Rights. The Commission found that it does not apply. Likewise, the PJM Tariff is unambiguous that costs for the Economic Projects at issue cannot be assessed to Merchant Facilities. The Commission mistakenly read Merchant Facilities into that cost-assessment provision, even though like PJM Tariff provisions show such an interpretation to be clear error. The Commission's contrary reading of the PJM Tariff is strained, illogical, and wrong.

For any or all of these reasons, the orders under review should be set aside.

## STATEMENT OF JURISDICTION

These consolidated appeals seek review of the Commission's Compliance Order (R.65), Tolling Order (R.70), and Rehearing Order (R.74). Petitioners timely sought rehearing of the Compliance Order, and timely petitioned this Court for review of the Rehearing Order. This Court has jurisdiction under 16 U.S.C. § 825*l*(b).

## STATEMENT OF ISSUES

The principal issue in this case is whether the Commission's orders rejecting PJM's proposed cost allocations for certain Lower Voltage Facilities and Economic Projects were arbitrary and capricious, because:

1. The Commission violated the fundamental tenet of cost allocation which requires that allocated costs must be at least roughly commensurate with benefits;

2. The Commission departed from this Court's decision in *ConEd*, 45 F.4th 265, and in so doing, departed from its longstanding policy and determinations on cost allocations based on having Firm Rights, and also failed to consider longstanding reliance interests;

3. The Commission failed to apply the PJM Tariff according to its plain text.

## PERTINENT STATUTES AND REGULATIONS

The relevant statutory provisions are reproduced in the attached Statutory Addendum.

## STATEMENT OF FACTS

### A. Allocation of Regional Plan Costs Based on Firm Rights

PJM is an independent system operator that oversees the electric grid in a large portion of the Mid-Atlantic and Midwest regions.[2] *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155-56 (2016). PJM exercises operational control over electrical-transmission grid facilities that belong to its members, supervising and

---

[2] PJM refers to *P*ennsylvania, New *J*ersey, and *M*aryland, the first three states where it operated. PJM also operates in all or parts of Delaware, Illinois, Indiana, Kentucky, Michigan, North Carolina, Ohio, Tennessee, Virginia, West Virginia, and the District of Columbia.

coordinating the movement of electricity throughout its control area. *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1227 (D.C. Cir. 2018). PJM also manages wholesale electricity markets through which generators sell electricity to buyers. *Id.* PJM fulfills these responsibilities through rules set forth in its Open Access Transmission Tariff ("PJM Tariff")[3] and its Operating Agreement.[4] *Old Dominion*, 892 F.3d at 1228.

PJM and its member utilities regularly conduct a planning process to determine what expansions and upgrades are necessary to meet regional electricity needs, the results of which are maintained in the PJM Regional Transmission Expansion Plan ("Regional Plan"). *See Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1256 (D.C. Cir. 2018); *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051, at PP 15-21 (2011) (requiring such a process). *See also Consol. Edison Co. of N.Y., Inc. v. FERC*, 155 FERC ¶ 61,088, at P 4, *reh'g denied*, 157 FERC ¶ 61,190 (2016), *vacated and remanded*, *ConEd*, 45 F.4th 265. The obligation to build transmission grid upgrades and the costs to construct those upgrades generally default to the utility in which the upgraded facility is located. But because Regional

---

[3] PJM, https://www.pjm.com/directory/merged-tariffs/oatt.pdf (last visited Feb. 17, 2023).

[4] PJM, https://www.pjm.com/directory/merged-tariffs/oa.pdf (last visited Feb. 17, 2023).

Plan projects also may benefit other grid users, the PJM Tariff allows the costs of many upgrade projects to be spread among transmission customers and Merchant Facilities across PJM's network.

Schedule 12 of the PJM Tariff outlines cost-allocation and cost-collection requirements for a broad category of Regional Plan enhancements to the PJM grid. *See Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 14 (D.C. Cir. 2021) (citing *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at PP 411-12 (2013), *order on reh'g & compliance*, 147 FERC ¶ 61,128 (2014)). Subsection (a) of Schedule 12 provides that transmission owners (e.g., utilities) may construct needed transmission enhancements, and provides that PJM may collect transmission enhancement charges from responsible customers. Subsection (b) of Schedule 12 establishes the methodologies for allocating and collecting costs of different categories of Regional Plan grid upgrades. For example, Subsection (b)(ii) establishes the cost-allocation methodology for high-voltage reliability projects, called "Regional Facilities," and Subsection (b)(v) establishes the cost assignment methodology for "Economic Projects," of which there are three types—acceleration projects in (b)(v)(A), modification projects in (b)(v)(B), and economic constraint projects in (b)(v)(C). Only the third category of Economic Projects—economic constraint projects under (b)(v)(C)—is at issue in the orders on review. Subsection (b)(x) of Schedule 12 (Merchant Transmission Facilities) is the sole section of Schedule 12 addressing the

collection of payments for grid upgrade costs from Merchant Facilities such as Hudson.

Initially, it was unclear that Merchant Facilities should be allocated costs for Regional Plan grid upgrade enhancements in the way that PJM transmission service customers are. In 2009, the Commission issued a foundational decision, Opinion No. 503, resolving the question. In the Compliance Order on review, the Commission refers to this bedrock Opinion No. 503 as simply the "Merchant Transmission Order."[5] The Commission concluded in Opinion No. 503 that Merchant Facilities with Firm Rights could be allocated Regional Plan costs, but only up to the amount of their Firm Rights. Those Firm Rights allow a set amount of electricity to be withdrawn from the PJM system under nearly all conditions. *See ConEd*, 45 F.4th at 272. As the Commission explained, "the reason for allocating RTEP upgrade costs to Merchant Transmission Facilities is that PJM is required to provide reliable service up to the Firm Transmission Withdrawal Rights held by these customers. In order to provide such rights, PJM must require the construction of RTEP upgrades." Opinion No. 503 at P 80 (C.A. ___-___). The Commission also determined in Opinion No. 503 that Merchant Facilities "can avoid these costs

---

[5] *PJM Interconnection L.L.C.*, 170 FERC ¶ 61,295, at P 3, nn.2 and 3 ("Compliance Order") (R.65; J.A. ___), o*rder granting reh'g for further consideration*, Docket No. ER18-680-002 (June 1, 2020) (not reported) ("Tolling Order") (R.70; J.A. ___), *order on reh'g*, 172 FERC ¶ 61,205 (2020) ("Rehearing Order") (R.74; J.A. ___-___).

if instead of opting for Firm Transmission Withdrawal Rights, they opt only for Non-Firm Transmission Withdrawal Rights under the tariff." *Id.* In that scenario of Non-firm Rights, the Commission concluded, "a Merchant Transmission Facility with Non-Firm Transmission Withdrawal Rights . . . would not be allocated [Regional Plan] charges." *Id.* at P 1 n.2 (C.A. ___).

In reliance on Opinion No. 503, Hudson contracted for 320 megawatts of Firm Rights from PJM in 2010, and Hudson went into operation in 2013.[6] Another Merchant Facility, Linden, contracted for 330 megawatts of Firm Rights from PJM. ConEd also held rights to 1,000 megawatts of firm transmission service under service agreements with PSEG, the adjacent utility in PJM, under which it also was assessed costs for PJM grid upgrades under Schedule 12 of the PJM Tariff. Under a 2009 Settlement between PSEG and ConEd, approved by the Commission in 2010,[7] ConEd was required to "pay Transmission Enhancement Charges during the term of its . . . service." *ConEd*, 45 F.4th at 287. The Settlement also made clear that "ConEd shall have no liability for Transmission Enhancement Charges . . . after the termination of[] said term of service." *Id.*

---

[6] *PJM Interconnection, L.L.C.*, 161 FERC ¶ 61,262, at P 4, n.8 (2017) ("December 15 Order") (C.A. ___), *reh'g denied*, 170 FERC ¶ 61,021 (2020).

[7] *PJM Interconnection, L.L.C. v. Pub. Serv. Elec. & Gas Co.*, 132 FERC ¶ 61,221 (2010), *order on reh'g*, 135 FERC ¶ 61,018 (2011), *pet. for review denied sub nom.*, *NRG Power Mktg., LLC v. FERC*, 718 F.3d 947 (D.C. Cir. 2013).

The Violation-based Method allocates costs for new grid upgrades based on the estimated contribution of PJM Zones and Merchant Facilities to the need for a new grid upgrade. *PJM Interconnection*, 142 FERC ¶ 61,214 at P 348. The Solution-based Method allocates costs for new grid upgrades based on the estimated use of the new grid upgrade by PJM Zones and Merchant Facilities. *Id.* PJM replaced the Violation-based Method with the Solution-based Method in 2013, in response to the Commission's Order No. 1000. *Id.* at 427. PJM stated that the Solution-based Method "is far superior" to the Violation-based Method, *id.* at 363, and the Commission agreed that it "is an improvement." *Id.* at 427.

### B.    Genesis of the Disputed Costs

In 2014, PJM started to assess skyrocketing grid upgrade transmission enhancement charges to Hudson, Linden, and ConEd, including costs for a project known as the Bergen-Linden Corridor Project that was undertaken to fix local utility short-circuit problems in New Jersey. *See ConEd*, 45 F.4th at 273-74. Faced with increasing grid upgrade cost assessments, ConEd notified PJM that it would not renew its transmission service contracts with PSEG in April 2017, thus eliminating ConEd's liability for Regional Plan costs after the date of termination. *See id.* at 287-88.

After ConEd terminated its service, PJM reallocated ConEd's cost assessments to the remaining zones and Merchant Facilities, including Hudson and

12

Linden.  PJM reallocated ConEd's share of costs for the Bergen-Linden Corridor Project largely onto Hudson ($634 million) and Linden ($132 million) using the Solution-based Method.  *Id.* at 275.  PJM also reallocated the rest of ConEd's existing Solution-based Method cost allocations to the remaining zones and Merchant Facilities, including Hudson and Linden.

For grid upgrade costs allocated to ConEd using the Violation-based Method and Economic Projects, the PJM Tariff included no method to reallocate ConEd's existing cost assessments to the remaining Zones and Merchant Facilities.  Instead, PJM created a new method, not in the PJM Tariff, to reallocate ConEd's existing Violation-based Method and Economic Project cost allocations to the remaining customers.[8]  Even though the PJM Tariff had no methodology to reallocate the cost assessments, PJM simply reallocated ConEd's existing Violation-based Method and Economic Project cost assessments on a *pro rata* basis to the remaining zones and Merchant Facilities' customers, based on each customer's relative Violation-based Method and Economic Project cost allocations.  Despite protests, the Commission accepted PJM's new cost allocations based on PJM's "*pro rata*" methodology for reallocating ConEd's existing Violation-based Method and Economic Project costs.

---

[8] PJM Interconnection, L.L.C., Revisions to Schedule 12-Appendix and Schedule 12-Appendix A, Docket No. ER17-950-000, at 7 (cited in Motion for Leave to Answer and Answer of Hudson to Protests of PJM TOS and NJBPU, Docket No. ER18-680, at 8 n.26 (Feb. 26, 2018) ("Hudson Answer to Protest") (R.27; J.A. ___)).

*See PJM Interconnection, L.L.C.*, 159 FERC ¶ 62,082 (2017), *reh'g denied*, 170 FERC ¶ 61,124 (2020).

Hudson and Linden thus receive additional new grid upgrade cost increases arising from PJM's reallocation of ConEd's existing Violation-based Method and Economic Project cost allocations to the remaining Zones and Merchant Facilities.

As a result of these massive (and ruinous) cost reassessments, Hudson and Linden both relinquished their Firm Rights that had been the basis for the costs assessments. *ConEd*, 45 F.4th at 286-87. On December 15, 2017, the Commission directed PJM to allow Hudson to convert its Firm Rights to Non-Firm Rights. *See* December 15 Order (C.A. ___-___). This Court affirmed that decision. *ConEd*, 45 F.4th at 289.

Hudson's conversion from Firm Rights to only Non-Firm Rights eliminated its (and NYPA's) responsibility for Regional Plan costs allocated pursuant to the Solution-based Method on the basis of Hudson's former Firm Rights.

### C.    Lower Voltage Facilities and Economic Projects

The present dispute concerns whether Hudson—and in effect, NYPA— must continue to pay for certain other Regional Plan projects that PJM previously allocated using the Violation-based Method and one of the three Economic Projects methodologies. The two types of projects at issue are Lower Voltage Facilities with cost allocations determined by the Violation-based Method and Economic Projects.

Lower Voltage Facilities are PJM reliability grid upgrades having a voltage of 345 kV single circuit and below.  Thus, they are not low voltage, just lower than the "Regional Facilities."  The costs of the facilities at issue in the orders on review are the Lower Voltage Facilities that were cost-allocated to Hudson using the Violation-based Method.  The Lower Voltage Facilities at issue are 45 grid upgrade projects scattered throughout the PJM region from New Jersey to Illinois consisting of tens of millions of dollars in costs that continue to be assigned to Hudson.  Because the grid upgrades were cost-allocated using the Violation-based Method, they are all included in tables set forth in the Appendix to Schedule 12 of the PJM Tariff, referred to as the Schedule 12-Appendix.  Grid upgrade projects allocated using the newer Solution-based Method are set forth in Schedule 12-Appendix A.

The largest of these Lower Voltage Facilities that continue to be cost-allocated to Hudson is a project called the Northeast Grid Reliability Project, a $975 million reliability project constructed by PSEG.[9]  Hudson—after ConEd's termination of its firm service—currently is assessed 16.05% of that project, which alone accounts for at least $136 million in continuing cost assessments to Hudson, amortized over the entire lifetime of the new grid upgrades, typically 40 to 50 years.  Therefore, under

---

[9] Request for Clarification and Rehearing of the New York Power Authority and Hudson Transmission Partners, LLC, Docket No. ER18-680-000, at 6 (Apr. 30, 2020) ("NYPA-Hudson Rehearing Request") (R.67; J.A. ___-___).

the Violation-based Method, cost allocations approved by the Commission in the orders on review, Hudson and NYPA will be forced by the Commission to continue to pay these grid upgrade costs to PJM for another approximately 40 years, amounting to approximately $12 million per year, even though Hudson no longer has any Firm Rights.[10]

Economic Projects are grid upgrades that are not needed for grid reliability, but rather to relieve one or more economic constraints for the benefit of load in PJM. Compliance Order at P 6, n.11 (J.A. ___). Schedule 12 of the PJM Tariff identified three different types of Economic Projects in Subsection (b)(v) ("Economic Projects") – (1) acceleration projects, in Subsection (b)(v)(A); (2) modification projects, in Subsection (b)(v)(B); and (3) new economic constraint projects in Subsection (b)(v)(C). PJM Tariff, Schedule 12, §§ (b)(v)(A), (b)(v)(B), and (b)(v)(C) (C.A. ___, ___, ___). Each of the three categories of Economic Projects in Schedule 12 has a different cost-allocation methodology, with different terms and conditions. *Id.* § (b)(v)(C) (C.A. ___). The category of Economic Projects at issue in the orders on review are "new economic constraint" projects, governed by

---

[10] For the Court's convenience, a list of the Lower Voltage Facilities that continue to be allocated to Hudson using the Violation-based Method at issue in the orders on review is included in Addendum A to this brief. That information is taken directly from PJM's filings in the underlying Commission docket. *See, e.g.*, PJM Interconnection, L.L.C., Compliance Filing, Docket Nos. ER18-680-000, *et al.*, at Att. A (Revisions to PJM Schedule 12-Appendix and Appendix A) (Jan. 19, 2018) ("Compliance Filing") (R.2; J.A. ___-___).

Schedule 12, Subsection (b)(v)(C). Rehearing Order at P 25 (J.A. ___). The Economic Projects that continue to be cost-allocated to Hudson are nine small projects scattered throughout the PJM region, with some as far away as Illinois. These projects are intended to relieve economic constraints on the transmission of electricity to load across the PJM system, and cost-responsibility for all of these projects is set forth in Schedule 12(b)(v)(C) of the PJM Tariff. *See* PJM Tariff, Schedule 12, § (b)(v)(C) (C.A. ___). The Commission is requiring Hudson (and so NYPA) to continue to pay the amortization of these costs for a lengthy span of years.[11]

After the Commission approved Hudson's conversion of its Firm Rights into Non-Firm Rights in 2017 but before this Court decided *ConEd*, PJM filed revisions to the PJM Tariff in a Compliance Filing to relieve Hudson (and NYPA) of the allocation of all Violation-based Method and Economic Projects costs associated with the Firm Rights Hudson previously held.[12] PJM's Compliance Filing specifically sought to end cost assessments for Lower Voltage Facilities that had been calculated using the Violation-based Method and Economic Projects that had been cost-allocated using the method in Subsection (b)(v)(C). However, the PJM

---

[11] For the Court's convenience, a list of the economic constraint Economic Projects that continue to be allocated to Hudson using the third category of Economic Projects cost-allocation in Subsection (b)(v)(C), that are at issue in the orders on review is set forth in Addendum B to this brief.

[12] *See generally* Compliance Filing (J.A. ___-___).

Transmission Owners (owners of the transmission facilities whose operations PJM manages) intervened and objected.  Both Hudson and NYPA intervened and filed answers opposing the protest of the PJM Transmission Owners, and explaining why PJM's proposed revisions to the PJM Tariff in its Compliance Filing removing Hudson's continuing cost allocations based on Violation-based Method and Economic Projects method should be accepted by the Commission.[13]

In the March 31, 2020 Compliance Order, the Commission agreed with the PJM Transmission Owners and rejected PJM's proposed revisions to the PJM Tariff, despite the fact that Hudson no longer held Firm Rights.[14]

### D.    The Commission Orders Under Review

In the Compliance Order, the Commission brushed aside Hudson's and NYPA's contention that it would be impermissible to ignore the language of Schedule 12 limiting the collection of Regional Plan costs from Merchant Facilities to collecting costs based only on actual Firm Rights.  Instead, the Commission accepted the PJM Transmission Owners' contention that cost-responsibility assignments under a Violation-based Method are fixed and cannot be changed.  The Commission found that, notwithstanding the fact that Hudson's Firm Rights were

---

[13] *See* Hudson Answer to Protest (J.A. ___-___); Motion for Leave to Answer and Answer of the New York Power Authority, Docket No. ER18-680-000 (Feb. 26, 2018) (R.26; J.A. ___-___).
[14] Compliance Order at PP 30-31 (J.A. ___-___).

reduced to zero after it relinquished those rights (and PJM could no longer assign new Regional Plan costs to Hudson), Hudson was still liable for Lower Voltage Facilities that were cost-allocated using the Violation-based Method listed in Schedule 12-Appendix, and Economic Projects that were cost-allocated using Schedule 12, Subsection (b)(v)(C). Compliance Order at P 28 (JA___-___).

In reaching this conclusion, the Commission did not address its earlier order approving the replacement of the Violation-based Method by the Solution-based Method. *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at PP 363, 427. Nor did the Commission address its prior determination that Hudson had properly avoided the cost assessment of grid upgrade enhancement charges for the Bergen-Linden Corridor Project by surrendering its Firm Rights.

Hudson and NYPA timely sought rehearing of the Compliance Order. *See* NYPA-Hudson Rehearing Request. They argued that the Compliance Order did not comply with the cost-causation principle, which states that allocated costs must be roughly commensurate with the benefits that payor derives from the project. *Id.* at 39-42 (J.A. ___-___). Here, Hudson and NYPA received no material benefits because they had surrendered the Firm Rights upon which the Commission determined in Opinion No. 503 that benefits are provided to Merchant Facilities that provide a basis for allocating grid upgrade costs. Hudson and NYPA also argued that the Compliance Order violated the Commission's longstanding policy under

19

Opinion No. 503 that Merchant Facilities can avoid continuing grid upgrade costs by converting their Firm Rights to Non-Firm Rights, and failed to account for the fact that Hudson and NYPA had relied on that policy when making the difficult decision to relinquish their Firm Rights in 2017.  *Id.* at 36-39 (J.A. ___-___).  And Hudson and NYPA argued that the Compliance Order wrongly interpreted PJM's Tariff, which does not bar the application of the "Merchant Transmission Facilities" provisions in Schedule 12, Subsection (b)(x), does not permit the allocation of costs to Merchant Facilities for economic constraint Economic Projects in Subsection (b)(v)(C), and expressly provides that grid upgrade costs can only be collected from Merchant Facilities based on actual Firm Rights.  *Id.* at 23-36 (J.A. ___-___).

On September 3, 2020, the Commission issued its Rehearing Order denying Hudson's and NYPA's requests for rehearing.  Rehearing Order at P 20 (J.A. ___).

### SUMMARY OF ARGUMENT

In the orders under review, the Commission overruled the judgment of PJM, the grid operator, and imposed continuing costs on Hudson and NYPA despite Hudson's surrender of the very Firm Rights that justified the cost allocations in the first place.  The orders should be set aside as arbitrary and capricious and contrary to law for at least three reasons.

I.  Most fundamentally, the Commission's orders violated the basic cost-causation principle that applies to all cost allocations under Section 205 of the

Federal Power Act.  The Commission never considered whether the costs it was imposing on Hudson and NYPA were commensurate with the benefits they received. It performed no detailed analysis of costs and benefits.

II.  Independently, the Commission violated its longstanding policy, first announced in Opinion No. 503 and subsequently upheld in numerous orders, including orders sustained on judicial review, that established the principle that Regional Plan grid upgrade project charges may be assigned to, and collected from, Merchant Facilities on the basis of their Firm Rights and that Merchant Facilities can avoid these costs if they opt only for Non-Firm Rights under the tariff.[15]

In departing from its longstanding policy without adequate explanation, the Commission also failed to consider the reasonable reliance interests of Hudson and NYPA, which made the difficult decision to surrender Hudson's Firm Rights precisely to avoid extremely high ongoing cost assessments that were allocated to Hudson based on the existence of those Firm Rights.  The Commission's unreasoned failure to account for those reliance interests was arbitrary and capricious.

III.  Lastly, the Commission's orders violated the plain text of the PJM Tariff, which unambiguously provides that grid upgrade costs for the Lower Voltage Facilities in question cannot be collected from Hudson and NYPA after surrendering

---

[15] Opinion No. 503 at P 80 (citing its own footnote 84) (C.A. ___-___).

their Firm Rights, and the category of Economic Projects in question cannot be allocated to Merchant Facilities.

A.   For the Lower Voltage Facilities in question—including the Northeast Grid Reliability Project—Schedule 12(b)(x)(B)(2) of the PJM Tariff provides that PJM shall base its collection of charges from a Merchant Facility "on the actual Firm Transmission Withdrawal Rights that have been awarded" to the Merchant Facility. (C.A. ___-___).   Yet the Commission ignored this plain text and erroneously concluded that the provision—and indeed all of Schedule 12(b)(x) addressing Merchant Facilities—did not apply to Hudson because the Lower Voltage Facilities in question were listed in Schedule 12-Appendix to the Tariff.  In so concluding, the Commission ignored the fact that the only methodology for collecting costs from a Merchant Facility is in Schedule 12(b)(x)—meaning that Schedule 12 *must* apply for Hudson and NYPA to have continuing payment responsibility for Lower Voltage Facilities such as the Northeast Grid Reliability Project.   The Commission's conclusion was arbitrary and capricious should be vacated.

B.  For the third category of Economic Projects that is in question, Schedule 12(b)(v)(C) unambiguously provides that costs may be allocated only to Zones and makes no reference at all to Merchant Facilities.  This stands in sharp contrast to the text of the other two categories of Economic Projects, including Schedule 12(b)(v)(A) and 12(b)(v)(B), which expressly authorize allocations to both "Zones

and Merchant Transmission Facilities," showing that the Tariff treats each category of Economic Projects as distinct. The Commission reasoned that Merchant Facilities with no Firm Rights should be treated as Zones because they place "load" on the PJM system, but the Commission ignored the fact that Merchant Facilities with no Firm Rights are not regarded as "load."

C. Finally, the Commission offered no reasoned basis for analogizing Economic Projects in Schedule 12(b)(v)(C) to another type of project, known as Targeted Market Efficiency Projects, in Schedule 12(b)(xvii) for purposes of allocating costs to Merchant Facilities. The analogy was arbitrary and capricious, because it ignored material differences in the PJM Tariff language for each type of project.

## STANDING

The orders under review require Hudson and NYPA to continue paying cost allocations, totaling at least $136 million over 40 years, for Lower Voltage Facilities whose costs were previously allocated using the Violation-based Method and Economic Projects cost-allocated under Schedule 12, Subsection (b)(v)(C). In doing so, the orders overruled PJM's proposed revisions to the PJM Tariff to relieve Hudson and NYPA of those continuing cost allocations and cost collections after Hudson surrendered its Firm Rights in 2017 precisely to avoid such payments. The Commission's orders therefore had direct economic impacts on Petitioners, and

Petitioners have standing to challenge them. *See Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1367 (D.C. Cir. 2004).

## STANDARD OF REVIEW

Under the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be[] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). That standard imports a requirement of reasoned decision-making: the Commission must examine the relevant data and "articulate[] a satisfactory explanation for its action." *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1042 (D.C. Cir. 2022) (citation omitted). To be sustained, the Commission's orders must demonstrate the markers of "principled and reasoned decision[making] supported by the evidentiary record." *Emera Me. v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (citation omitted). The Commission also must base its decisions on substantial evidence, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015) (citation omitted); *see* 5 U.S.C. § 706(2)(E).

# ARGUMENT

## I.   The Commission Approved Cost Allocations That Violate the Cost-Causation Principle.

### A.   The Commission Did Not Perform a Cost-Causation Analysis.

At the most fundamental level, the Commission failed to perform any analysis of costs and benefits for the Regional Plan costs that it ordered Hudson and NYPA to continue to bear, by rejecting the portions of PJM's Compliance Filing that proposed to eliminate Hudson's continuing grid upgrade cost assessments.  Had the Commission performed that analysis, it  could not have concluded that the costs were roughly commensurate with the benefits that Hudson and NYPA receive, because Hudson and NYPA have no Firm Rights.

Cost-causation is a fundamental requirement of Section 205 of the Federal Power Act, which requires that all rates and charges be "just and reasonable."  16 U.S.C. § 824d(a).  For decades, the Commission and the courts have understood the just and reasonable" requirement of Section 205 of the Federal Power Act "to incorporate a 'cost-causation principle.'"  *Old Dominion*, 898 F.3d at 1255.  The cost-causation principle reflects the commonsense notion that the rates charged for electricity should reflect the costs of providing it.  *See id*.  The Commission also embodied the cost-causation principle in its Order No. 1000, which embodies that as Principle 1:

> The cost of transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a

25

> manner that is at least roughly commensurate with the estimated benefits.

Order No. 1000 at P 622.  This Court also has emphasized that costs must "be allocated to those . . . that benefit from those [projects] in a manner that is at least roughly commensurate with estimated benefits." *Old Dominion*, 898 F.3d at 1256 (citation omitted).  In ensuring compliance with this principle, reviewing courts require that the Commission actually compare "the costs assessed against a party to the burdens imposed or benefits drawn by that party." *Id.* at 1260 (citation omitted); *see also Midwest ISO Transmission Owners*, 373 F.3d at 1368 (Roberts, J.) (explaining that compliance with the cost-causation principle is determined by "comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party").

The Compliance Order failed to conduct any type of current cost-causation analysis.  The Commission ignored any need to compare its ongoing grid upgrade cost allocation and cost collection from Hudson and NYPA with the benefits that Hudson and NYPA receive, now that they have given up their Firm Rights.  In Opinion No. 503, the Commission found that the two "benefits" upon which Merchant Facilities with Firm Rights could be allocated grid upgrade costs using the Violation-based Method were:  (1) PJM must plan its system to provide future reliable service to Merchant Facilities with Firm Rights just like PJM does for load on the PJM system (Opinion No. 503 at PP 25, 80 (C.A. ___-___, ___-___)); and

26

(2) PJM must provide Merchant Facilities with reliable firm service up to the amount of Firm Rights that they hold.  *Id.* at PP 80, 110 (C.A. ___-___, ___-___).

In Opinion No. 503, the Commission established that Merchant Facilities can be allocated costs for grid upgrades using the Violation-based Method.  The Commission also established in that order the benefits upon which the grid upgrade cost allocations would be based, explaining that the reason for allocating Regional Plan costs to Merchant Facilities is that PJM is required to provide reliable service up to the Firm Rights held by the customers <u>but</u> that Merchant Facilities can avoid these costs if they opt only for Non-Firm Rights under the Tariff.  Opinion No. 503 at P 80 (C.A. ___-___).  *See also* December 15 Order at P 50 (C.A. ___-___) (allowing Hudson to convert its Firm Rights to Non-Firm Rights).

Now that Hudson has relinquished its Firm Rights, PJM no longer plans its system to provide reliable service to Hudson, and PJM no longer provides firm service to Hudson.  The two benefits upon which the Commission established the basis for allocating costs to Merchant Facilities using the Violation-based Method to Hudson no longer exist.  The Commission ignored this critical fact in the Compliance Order.

Despite Hudson and NYPA presenting these inadequacies in their rehearing request (NYPA-Hudson Rehearing Request at 40-42 (J.A. ___-___)), the Rehearing

Order failed to perform any cost-causation analysis as established in Opinion No. 503.

Although the Rehearing Order mentions benefits, it does so only in general terms; arguing by assertion and never comes close to satisfying the requirement to conduct a cost-benefit analysis.

The Commission's orders never contend that the costs at issue are roughly commensurate with benefits. In fact, the orders are silent on the subject.

The logic of the Commission's position is based on the fact that it has a methodology, even though, as shown below, it concluded almost ten years ago that its chosen methodology—the Violation-based Method—failed to assign costs on a current basis to those customers who benefit from the costs.

The Commission's conclusion that Hudson must continue to be allocated at least $136 million in costs for grid upgrades for the next 40 years cannot be considered the product of reasoned decision-making.

**B.** **The Commission's Findings of Deficiencies of Violation-Based Cost Allocation.**

The Commission's only reference to benefits with respect to the grid upgrade projects was in noting that their costs were assessed using the Violation-based Method, but that reliance ignores the Commission's own determinations about the Violation-based Method.

28

Before the establishment of the currently effective Solution-based Method used for cost allocation in Schedule 12, PJM used the Violation-based Method. The Violation-based Method assessed costs for Regional Plan grid upgrade projects to customers based on an analysis attempting to determine which zones of Merchant Facilities caused the need for the grid upgrade project. The Commission approved PJM's replacement of the Violation-based Method with the Solution-based Method precisely because it failed to account for ongoing benefits from Regional Plan projects. When the Commission considered PJM's Order No. 1000 compliance filing, which led to the acceptance of the Solution-based Method, the Commission recounted the position of the PJM Transmission Owners:

> [T]he Violation-Based DFAX method is a static or "snapshot" method, the Solution-Based DFAX method may be updated annually to capture changes in the distribution of the benefits of the new transmission facility. . . .

*PJM Interconnection*, 142 FERC ¶ 61,214 at P 379. The Commission agreed with the PJM Transmission Owners that the prior Violation-based Method did not adequately measure who benefits from a grid upgrade over time. *Id.* at P 427.

Nonetheless, the Commission's orders on review directed PJM to reinstate cost allocations to Hudson (and NYPA) for Lower Voltage Facilities based on its abandoned Violation-based Method.

These inherent structural weaknesses in the Violation-based Method, and key reasons why the method was abandoned by PJM and the Commission, should foreclose deference to that method in the Commission's orders under review.

## II.    The Commission Arbitrarily Departed From Its Longstanding Policy That Cost Allocations for Merchant Facilities Are Based on Firm Rights.

### A.    The Commission's Orders Are Inconsistent With Opinion No. 503.

In Opinion No. 503, the Commission conducted a comprehensive review of how and what costs for PJM Regional Plan upgrades should be allocated to Merchant Facilities and decided whether it would allow PJM to allocate and collect grid upgrade charges from Merchant Facilities, and what benefits justified such cost allocations.  Hudson and NYPA—and other Merchant Facilities—have relied on Opinion No. 503 since it was issued by the Commission more than ten years ago. The Commission established that "the reason for allocating [Regional Transmission Enhancement Plan] upgrade costs to Merchant Transmission Facilities is that PJM is required to provide reliable service up to the Firm Transmission Withdrawal Rights held by these customers."  Opinion No. 503 at P 80 (citing its own footnote 84) (emphasis added) (C.A. ___-___)

If the Merchant Facilities have Firm Rights, PJM must plan for them and provide firm service, and in return PJM will allocate and collect Regional Plan grid upgrade costs from the Merchant Facility.  The Merchant Facility "can avoid these costs" by opting for Non-Firm Rights instead of Firm Rights.  In contrast, the

30

Commission also determined in Opinion No. 503 that PJM exports should not be subject to Regional Plan cost responsibility, because PJM is not required to plan its system to accommodate them. In Opinion No. 503 the Commission drew a distinction between Merchant Facilities with Firm Rights for which PJM must provide firm service—which are cost-allocated grid upgrade costs—and non-firm exports from the PJM system—which are not cost-allocated grid upgrade costs. Opinion No. 503 at PP 79-80 (C.A. ___-___). The Commission found the distinction to be that for Merchant Facilities with Firm Rights, PJM must plan to provide firm service and actually provide firm service, but for non-firm exports, PJM must do neither. Therefore, the Commission found that it was appropriate—and not unduly discriminatory or preferential—to allocate Regional Plan grid upgrade costs to Merchant Facilities with Firm Rights, and not to allocate any grid upgrade costs to non-firm exports. *Id.* at P 79 (C.A. ___). The Non-Firm Rights that are now held by Hudson are directly analogous to the non-firm exports the Commission addressed in Opinion No. 503, and distinguishable from the cost-allocation treatment for Merchant Facilities with Firm Rights.

Because Hudson (and NYPA) have only Non-Firm Rights, PJM is not required to plan its system to accommodate Hudson's Non-Firm Rights and Hudson is not guaranteed firm service. No Regional Plan grid upgrade costs should be allocated to or collected from Hudson and NYPA. That is precisely what PJM

31

proposed to do in the tariff revisions that the Commission rejected. The Commission's orders on review fail to provide a reasoned explanation for abandoning the *quid pro quo* established in Opinion No. 503, or any justification for continuing to allocate and collect charges from Hudson even though it no longer receives any of the benefits which justified the allocation of grid upgrade cost to Merchant Facilities with Firm Rights.[16]

In its Rehearing Order, the Commission attempts to dismiss Opinion No. 503 by stating "[b]ut those statements were just that, general statements." Rehearing Order at P 31 (J.A. ___). That superficial justification is insufficient to justify a 180-degree departure from the bedrock order on cost allocation to Merchant Facilities— what the Commission itself calls the "Merchant Transmission Order."

**B.    The Commission's Orders on Review Are Inconsistent With the December 15 Order Approving Hudson's Surrender of its Firm Rights, and This Court's Decision in *ConEd* Upholding the Commission's Order.**

The Orders on Review not only fail to conform to Opinion No. 503, they also cannot be reconciled with the December 15 Order. There the Commission stated that a Merchant Facility that does not have Firm Rights does not receive cost allocations for Regional Plan grid upgrades. December 15 Order at P 49 (C.A. ___-___). *Accord Linden VFT, LLC v. Pub. Serv. Elec. & Gas Co.*, 161 FERC ¶ 61,264,

---

[16] *See* NYPA-Hudson Rehearing Request at 12 (J.A. ___).

at P 32 (2017), *reh'g denied*, 170 FERC ¶ 61,023 (2020).  Hudson and NYPA relied on the December 15 Order, as a basis for giving up their Firm Rights, for which they had originally paid $335 million.  More than two years later, in the March 2020 Compliance Order, the Commission pulled the rug out from under Hudson and NYPA, and reversed course on what it said in the December 15 Order and Opinion No. 503.

In its December 15 Order, the Commission stated that, contrary to the PJM Transmission Owners' request, the PJM Tariff does not require a Merchant Facility like Hudson to continue to receive cost allocations for the lifetime of an upgrade project just because the Merchant Facility held Firm Rights at the time the grid upgrade costs were first allocated.  The Commission emphasized that:

> Contrary to PSEG's assertion, the PJM tariff does not require a merchant transmission facility, like [Hudson], to be allocated costs for an [Regional Transmission Enhancement Plan] project over the life of that project based on the [megawatts] of Firm [Transmission Withdrawal Rights] the merchant transmission facility held at the time that the [Regional Transmission Enhancement Plan] project was approved by PJM.

December 15 Order at P 50 (C.A. ___-___) (internal footnote omitted) (emphasis added).  *See also id.* n.58 (citing Order No. 503 for support); *Linden*, 161 FERC ¶ 61,264 at P 31.  By rejecting PSEG's protest, the Commission confirmed that Hudson is not required to pay Regional Plan grid upgrade cost allocations for the entire 40-50 year life of the grid upgrade, and cost allocations can and will be

changed if Hudson no longer has Firm Rights.  Hudson and NYPA relied on the

December 15 Order.

At that time, the Commission made it clear that by relinquishing Firm Rights,

Hudson's cost responsibility for Regional Plan grid upgrade projects would be at an

end:

> As of the effective date of [Hudson's] conversion of its Firm [Transmission Withdrawal Rights] to Non-Firm [Transmission Withdrawal Rights], PJM is no longer required to provide firm service and can curtail non-firm service whenever necessary to preserve reliability.  Under Schedule 12, therefore, [Regional Transmission Enhancement Plan] upgrade costs would no longer be allocable to [Hudson].

December 15 Order at P 50 (C.A. ___-___) (internal citations omitted), *aff'd*, *ConEd*

*v. FERC*, 45 F.4th at 290.

This is not some inference drawn by an advocate.  The Commission made

these statements in its December 15 Order, directly addressing Hudson's

relinquishment of its Firm Rights, and providing the Commission's approval for

Hudson to do so.

### C.    The Commission Offered No Reasoned Basis for Departing From Its Longstanding Policy

In the Compliance Order, the Commission defended its position by asserting

that its December 15 Order concerned only those cost allocations revised annually

pursuant to Schedule 12(b)(i), (b)(ii), and (b)(iii) using the Solution-based Method,

whereas costs for Lower Voltage Projects using the Violation-based Method with the results in Schedule 12-Appendix are allocated only once. The Commission asserted that under Schedule 12(a)(v), prior cost allocations for which the results are included in Schedule 12-Appendix will not be changed *"[e]xcept as specifically set forth herein . . . ."* Compliance Order at P 28 (J.A. ___-___) (emphasis in original). The Commission then remarkably claims that—because of Schedule 12(a)(v)—the requirements of Schedule 12(b)(x) ("Merchant Transmission Facilities"), which establishes (1) who will pay charges, as between the Merchant Facility owner and its transmission service customers (Schedule 12(b)(x)(A)), and (2) the basis for collecting any charges from Merchant Facilities with Firm Rights (Schedule 12(b)(x)(B)), simply "do not apply" to cost allocations and cost collections determined using the Violation-based Method. Compliance Order at P 28 (J.A. ___-___); Rehearing Order at PP 20, 21 (J.A. ___, J.A. ___-___).

That explanation is too facile. The Commission's claim that Schedule 12(b)(x)(b)(2) could not, and cannot, apply to cost allocations using the Violation-based Method completely ignores the fact that at the time the terms of Schedule 12(b)(x)(b)(2) were added to the PJM Tariff as result of Opinion No. 503, the Violation-based Method was the only method in the PJM Tariff for the allocation of costs of Lower Voltage Facilities; the Solution-based Method did not yet exist. The Commission's claim that the requirements of Schedule 12(b)(x) "do not apply" to

35

costs allocated using the Violation-based Method is unsupported by the facts or precedent.

The Commission also claims in the orders on review—based on Schedule 12(a)(v)—that the cost allocations using the Violation-based Method, the results of which are set form in the tables in Schedule 12-Appendix, are "fixed allocations" that are done "only once" and can never be changed. Rehearing Order at PP 23, 24 (J.A. ___, J.A. ___). However, the Commission has not always believed Violation-based Method cost allocations to be fixed for all time. Following the expiration of ConEd's firm service, the Commission approved new cost reallocations under the Violation-based Method, to reallocate ConEd's cost allocations to all of the remaining zones and Merchant Facilities. Hudson Answer to Protest at 7-10, 21-22 (J.A. ___-___, J.A. ___-___). That reallocation—of Violation-based Method cost allocations—caused Hudson's cost allocation for the Northeast Grid Reliability to increase from 14.6% to 16.05%—an increase of over $12 million to Hudson from the Violation-based Method cost reallocation alone. NYPA-Hudson Rehearing Request at 12-13 (J.A. ___-___). The Commission's claims in the Rehearing Order that the cost allocations using the Violation-based Method are sacrosanct, fixed, and can never be changed is simply contrary to the Commission's own precedent. The Commission's justification for refusing to accept PJM's proposal to make an

identical change following the termination of Hudson's and NYPA's Firm Rights is unsupported and inconsistent with its own orders.

Moreover, to insist that the "prior allocations will not be changed" while simultaneously maintaining that the allocations were commensurate with benefits could only happen by sheer coincidence, especially when the Merchant Facility, like Hudson, no longer receives firm service from PJM. The Commission provides no reasoned explanation for now claiming that Violation-based Method and Economic Project cost allocations cannot be reallocated after Hudson no longer holds Firm Rights.

In departing from its Opinion No. 503 determination, the Commission also failed to account for the Hudson's and NYPA's reliance interests on those determinations. "In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (citation omitted). Here, Hudson and NYPA paid $335 million to acquire Firm Rights in 2010. When they made the consequential decision to give up those rights in 2017 to avoid even more costly Regional Plan cost allocations and collections, Hudson and NYPA relied on the policy the Commission announced in Opinion No. 503 and the December 15 Order. They relied upon the Commission's

37

earlier guidance and the Commission's failure account for these reliance interests was arbitrary and capricious.

## III. The Commission Failed to Enforce the PJM Tariff According to Its Terms.

Finally, the Commission's orders should be vacated because they approved continuing cost allocations and cost collections that violate the PJM Tariff. The Commission overrode PJM's recognition that nothing in its Tariff authorizes the allocation of costs to Merchant Facilities that have surrendered their Firm Rights. The Commission erroneously refused to enforce a Tariff provision mandating that the collection of costs for the Northeast Grid Reliability Project and other Lower Voltage Projects, be based on actual Firm Rights.

With respect to the Economic Projects at issue, the Commission failed to recognize that the PJM Tariff provides for the allocation of costs for this category of economic constraint projects only to Zones, not Merchant Facilities, and by treating Merchant Facilities with no Firm Rights as "load" for purposes of allocating these Economic Project costs, without regard to the PJM Tariff.

The Commission also erred by treating the Economic Projects the same as Targeted Market Efficiency Projects, which are a different type of grid upgrade project with different attributes and demonstrably different PJM Tariff language, which unlike the Economic Projects Tariff language at issue, expressly allocates

38

costs to both Zones and Merchant Facilities. Any of these errors independently warrants vacating the orders.

### A.    Northeast Grid Reliability Project.

The vast majority of Violation-based Method costs for which the Commission has directed that cost responsibility be re-imposed on Hudson and NYPA relate to the Northeast Grid Reliability Project, a $975 million reliability project to upgrade PSEG's power service and install underground transmission circuits in northern New Jersey. After Hudson surrendered its Firm Rights, PJM filed revised cost-responsibility assignments on January 19, 2018, to remove the cost allocations to Hudson and NYPA for Lower Voltage Facilities that use the Violation-based Method in Schedule 12-Appendix. *See generally* Compliance Filing (J.A. ___-___). The Commission overrode PJM's interpretation of the Tariff and rejected the proposed revisions. Compliance Order at P 24 (J.A. ___). The Compliance Order re-imposed 16.05% of the $975 million in costs for the Northeast Grid Reliability Project, or at least $136 million, to be collected from Hudson and NYPA over the duration of the approximately 40-plus year life of the grid upgrade project. But the plain text of Schedule 12(b)(x)(B)(2) precludes the Commission's action, because Hudson no longer holds Firm Rights.

1.    **Schedule 12 Unambiguously States That PJM May Not Collect Costs From Merchant Facilities That Relinquish Firm Rights.**

Schedule 12(b)(x) of the PJM Tariff ("Merchant Transmission Facilities"): (1) establishes that the owner of the Merchant Facility is responsible for paying Regional Plan grid upgrade costs associated with a Merchant Facility (Subsection (b)(x)(A));[17] and (2) specifies the conditions under which a Merchant Facility is subject to the collection of costs for Regional Plan grid upgrades (Subsection (b)(x)(B)). Schedule 12(b)(x)(B) concerns the collection of costs from Merchant Facilities. As relevant here, Schedule 12(b)(x)(B)(2) states that PJM shall base the "collection" of a Merchant Facility's costs on its "actual" Firm Rights:

> Transmission Provider shall base the *collection* of Transmission Enhancement Charges associated with Required Transmission Enhancements from a Merchant Transmission Facility on the *actual Firm Transmission Withdrawal Rights* that have been awarded to the Merchant Transmission Facility . . . .

NYPA-Hudson Rehearing Request at 17 (J.A. ___) (citing PJM Tariff, Schedule 12(b)(X)(B)(2)) (emphasis added). Hudson surrendered its Firm Rights on

---

[17] The provision in Schedule 12(b)(x)(a) regarding "who" is responsible for payment of any grid upgrade costs was added to the PJM Tariff in 2006, when the Violation-based Method applied, and long before Opinion No. 503, Order No. 1000, the Solution-based Method, or the addition of Schedule 12(a)(v). *PJM Transmission Owners*, 115 FERC ¶ 61,345, at PP 3, 5, 19, 24 (2006), *reh'g denied*, 120 FERC ¶ 61,013 (2007). It does not address the methodology for allocating or collecting costs, and is not relevant here.

December 15, 2017, effective December 31, 2017.  Compliance Order at PP 1 n.1, 9 (J.A. ___, J.A. ___).  Thus, consistent with the unambiguous text of Schedule 12(b)(x)(B)(2), Schedule 12 costs may not be collected from Hudson after December 31, 2017.

On a further note, in the Rehearing Order, in addressing Schedule 12(b)(x), the Commission references Schedule 12(b)(x)(A) and asserts that language does not support Hudson and NYPA's position.  Rehearing Order at P 24 (J.A. ___).  The Commission apparently confused the text of PJM Tariff Schedule 12(b)(x)(A) with the text of Schedule 12(b)(x)(B)(2), on which Hudson and NYPA's argument is based.   The Commission entirely failed to analyze the text of Schedule 12(b)(x)(B)(2).

Recently, in a decision that post-dates the Compliance Order and Rehearing Order under review, this Court held that the right to collect costs under Schedule 12 is distinct from the right to allocate responsibility for those costs.  *See Long Island Power Auth. v. FERC*, 27 F.4th 705 (D.C. Cir. 2022).  This Court agreed based on "[t]he plain meaning of 'collected'" in the relevant provision of the PJM Tariff, Schedule 12-C(4)(c).  *Id.* at 716.  The Court explained:

> In that context, "collect" means "[t]o call for and obtain payment of." *Collect*, *American Heritage Dictionary* (5th ed. 2018); *accord Collect*, *Oxford English Dictionary* (2d ed. 1989) ("[t]o gather (contributions of money, or money due, as taxes, etc.) from a number of people").  FERC has not identified a single example, in a dictionary or otherwise, where

"collect" means to accrue liability.  Nor have we found any.  This strongly suggests that "collect" simply cannot bear that meaning.

*Id.* at 716-17 (citing *DHS v. MacLean*, 574 U.S. 383, 394 (2015)).  The Court's decision in *Long Island Power Authority* strongly supports the same plain-text reading of "collection" in Schedule 12(b)(x)(B)(2).

Accordingly, costs cannot be collected from Hudson after December 31, 2017, the effective date for Hudson's surrender of its Firm Rights.

> ### 2.    The Commission's Orders Disregard the PJM Tariff's Unambiguous Text and History.

The Commission avoided this straightforward reading of the PJM Tariff's text by concluding that a separate provision of the Tariff "exempts" Lower Voltage Facilities with costs assessed by the Violation-based Method and Economic Projects from Schedule 12(b)(x).  Rehearing Order at P 20 (J.A. ___).  Specifically, for Lower Voltage Projects, the Commission relied on Schedule 12(a)(v), which states, in part: "***Except as specifically set forth herein,*** *nothing in this Schedule 12 shall change the assignment of cost responsibility or classification of Required Transmission Enhancements included in Tariff, Schedule 12-Appendix.*"  *Id.* at P 21 (J.A. ___-___) (quoting PJM Tariff, Schedule.12(a)(v)) (emphasis in original; bold emphasis added).  In the Commission's view, Schedule 12(b)(x)(B)(2)'s command that the collection of costs from Merchant Facilities must be based on actual Firm Rights did not qualify as an exception "specifically set forth herein" because cost assignments

in Schedule 12-Appendix are "fixed," i.e., PJM assigned them "only once, when it planned the project," using the Violation-based Method. *Id.* at PP 23-24 (J.A. \_\_\_-\_\_\_). The Commission's reasoning strayed far from the text and rested on several incorrect assumptions.

Neither Schedule 12(a)(v) nor 12(b)(x)(B)(2) mentions the Violation-based Method, and the requirement that costs be collected from Merchant Facilities based on their actual Firm Rights does not carve out costs allocated based on the Violation-based Method to permit their collection. Nor would inferring such a carveout in Schedule 12(b)(x)(B)(2) be reasonable.

When PJM first filed the provisions now found in Schedule 12(b)(x)(B)(2) in 2010 in compliance with the Commission's then-new Opinion No. 503, the Violation-based Method was the *only* methodology for allocating costs of Lower Voltage Facilities to Merchant Facilities. *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,242, at P 1 (2012) (accepting PJM's Opinion No. 503 Compliance Filing filed on February 19, 2010, including Schedule 12(b)(x)(B)(2)). PJM proposed the limitation for costs based on actual Firm Rights "[i]n compliance with Opinion No. 503."[18] Thus, from the start, the provision in Schedule 12(b)(x)(B)(2) limiting the collection of costs to those based on actual Firm Rights has applied to costs allocated

---

[18] PJM Interconnection, L.L.C., Opinion No. 503 Compliance Filing, Docket Nos. EL07-57-008, *et al.*, at 1 (Feb. 19, 2010) ("PJM Opinion No. 503 Compliance Filing") (C.A. \_\_\_-\_\_\_).

based on the Violation-based Method.  The Commission's decision to manufacture a carveout for costs allocated with the Violation-based Method is contrary to Schedule 12(b)(x)(B)(2)'s text and history.

The Commission also erred in assuming that PJM allocates costs under the Violation-based Method and the Economic Projects method only once, after which time they become fixed.  In fact, the Violation-based Method and Economic Project costs at issue in this case were shifted to Hudson and NYPA *because of* a reallocation of costs under the Violation-based Method and Economic Projects method, after ConEd allowed its transmission service agreements with PJM to expire.[19]  PJM acknowledged that the PJM Tariff provided no process to reallocate these cost assessments.[20]  PJM instead proposed to reallocate the Violation-based Method and Economic Project costs on a *pro rata* basis to the remaining customers, and the Commission approved this reallocation of ConEd's Violation-based Method and Economic Projects using PJM's proposed *pro rata* method.  *PJM Interconnection*, 170 FERC ¶ 61,124 at PP 1, 21, 25, 30.  Given the Commission's acceptance of PJM's *pro rata* method for reallocating costs, the Commission cannot reasonably

---

[19] *See* NYPA-Hudson Rehearing Request at 12-13 (J.A. ___-___).

[20] PJM Interconnection, L.L.C., Revisions to Schedule 12-Appendix and Schedule 12 Appendix A to Address ConEd Termination, Docket No. ER17-950-000, at 7 (Feb. 8, 2017) (*see* Hudson Answer to Protest at 8 (J.A. ___), which was accepted in the Compliance Order at P 23 (J.A. ___).

claim that there is no way to reallocate costs that were assessed using the Violation-based Method or Economic Projects method.

Even if there were a textual basis to assume that PJM could allocate costs for Lower Voltage Facilities to Merchant Facilities only once under the Violation-based Method, there was no basis to assume that PJM could continue to *collect* such costs based on Firm Rights that the Merchant Facility had surrendered. Schedule 12(b)(x)(B)(2)'s explicit command to base "collection" of costs on "actual" Firm Rights precludes collecting costs from NYPA and Hudson based on *past* Firm Rights that no longer exist. Schedule 12(b)(x)'s distinction between costs "allocated" (Schedule 12(b)(x)(A)) and the "collection" of costs (Schedule 12(b)(x)(B)(2)) must be given effect. In a related context, this Court recently held that the word "collect" in the PJM Tariff cannot mean "to accrue liability." *Long Island Power Auth.*, 27 F.4th at 716-17; *cf. Nat'l Insulation Transp. Comm. v. ICC*, 683 F.2d 533, 537 (D.C. Cir. 1982) ("we presume that the use of different terminology within a statute indicates that Congress intended to establish a different meaning"). The distinction is reasonable, because it is entirely possible to allocate costs to a Merchant Facility but "defer collection" of those costs in the event the Merchant Facility's commercial operation is delayed or until it has actually been awarded Firm Rights.[21]

---

[21] *See* PJM Tariff, Schedule 12(b)(x)(B)(1) (C.A. ___) ("Transmission Provider shall defer collection of Transmission Enhancement Charges from a Merchant

It is indisputable that the provisions of Schedule 12(b)(x) apply to Schedule 12-Appendix, because Schedule 12(b)(x) provides the only basis for cost collections from Merchant Facilities and their owners in the first place. Schedule 12(b)(x)(A) designates the owner of a Merchant Facility as the "Responsible Customer" for cost assessments, including cost assessments pursuant to Schedule 12-Appendix. Schedule 12-Appendix does not independently provide that authority. If this requirement does not apply to Schedule 12-Appendix cost allocations, then Merchant Facilities could not be designated as "Responsible Customers" for cost allocations listed in Schedule 12-Appendix. In other words, Schedule 12-Appendix would be incomplete without the provisions of Schedule 12(b)(x). There is no textual basis (and the Commission identified no basis) to import some terms of Schedule 12(b)(x) into Schedule 12-Appendix but omit the foundational command that costs may be collected from a Merchant Facility based only on the "actual Firm Transmission Withdrawal Rights that have been awarded to the Merchant Transmission Facility." PJM Tariff, Schedule 12(b)(x)(B)(2) (C.A. ___).

Furthermore, Schedule 12 necessarily applies to the cost allocations in Schedule 12-Appendix because those were the only allocations that existed when the Commission accepted Schedule 12(b)(x); Schedule 12-Appendix A did not exist

---

Transmission Facility until the Merchant Transmission Facility goes into commercial operation [in certain circumstances] . . .").

46

at the time.[22]  When PJM first filed the provisions now found in Schedule 12(b)(x) in 2010, the only cost allocations anywhere in Schedule 12 were in Schedule 12-Appendix.  The provisions of Schedule 12(b)(x) therefore apply to costs allocated using the Violation-based Method.  The Commission later accepted the Schedule 12(b)(x) provisions, including the language addressing collection of charges from Merchant Facilities.  *PJM Interconnection*, 139 FERC ¶ 61,242 at P 1.  As originally adopted, the language now in Schedule 12(b)(x) applied to the allocations using the Violation-based Method in Schedule 12-Appendix.

As this chronology shows, the requirement in Schedule 12(b)(x)(B)(2) that PJM's collection of Regional Plan charges be based on a Merchant Facility's actual Firm Rights *must* apply to Schedule 12-Appendix cost allocations—including Violation-based Method cost allocations—because there was no other cost allocation methodology in Schedule 12 at the time Schedule 12(b)(x) was adopted.

Accordingly, the Commission's statement that "the requirements of Schedule 12, section (b)(x) . . . do not apply to prior cost allocations [under the

---

[22] Schedule 12-Appendix A was first filed by PJM in connection with PJM's compliance with Order No. 1000's regional cost-allocation requirements on October 11, 2012.  *See PJM Interconnection, L.L.C.*, PJM Open Access Transmission Tariff Revisions to Modify Cost Allocation for PJM Required Transmission Enhancements, Docket No. ER13-90-000 (filed Oct. 11, 2012) (C.A. ___-___).  The Commission later accepted the Schedule 12-Appendix A provisions with an effective date of February 1, 2013.  *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,074 (2013); *PJM Interconnection*, 142 FERC ¶ 61,214.

Violation-based Method] for Lower Voltage Facilities included in Schedule 12-Appendix" is incorrect and contrary to the plain language and history of Schedule 12(b)(x).

### B.    Economic Projects.

Schedule 12(b)(v) of the PJM Tariff provides for the assignment of costs for three categories of so-called Economic Projects, which are economic-based enhancements for which there is no reliability-based need.[23]  Schedule 12(b)(v) specifies three separate methodologies for allocating costs for three different categories of Economic Projects:  (1) acceleration projects in Schedule 12(b)(v)(A); (2) modifications to Reliability Projects in Schedule 12(b)(v)(B); and (3) economic constraint projects in 12(b)(v)(C).  Each category provides a different methodology for cost assessment.  The Economic Projects at issue here are the third category of economic constraint projects, which applies to new enhancements or expansions that could relieve one or more economic constraints, but for which no reliability-based need has been identified.  Rehearing Order at P 25 (J.A. ___) ("Economic Projects allocated pursuant to Schedule 12, section (b)(v)(C)").  Importantly, that section of the PJM Tariff—Schedule 12(b)(v)(C)—specifies that costs for such Economic Projects will be allocated only to "Zones," but does not mention Merchant Facilities.

---

[23] Economic Projects are distinct from projects required for reliability.

Nevertheless, the Commission determined that Schedule 12(b)(v)(C) required the allocation of costs to Merchant Facilities.

Not only does the Commission's interpretation alter the plain text of the Tariff, but it inappropriately treats Merchant Facilities with no Firm Rights as "load" in PJM when the Commission has found elsewhere that Merchant Facilities that do not have Firm Rights are not load in PJM. These errors independently warrant setting aside the Commission's orders.

### 1. The Commission Ignored That Costs for Schedule 12(b)(v)(C) Economic Projects May Only Be Allocated to Zones, Not Merchant Facilities.

Schedule 12(b)(v)(C) provides that transmission providers "shall assign cost responsibility for Economic Projects that are new enhancements or expansions that could relieve one or more economic constraints . . . *to the Zones* that show a decrease in the net present value of the Changes in Load Energy Payment."[24]  It further provides that "[c]ost responsibility shall be assigned based on *each Zone's* pro rata share of the sum of the net present values of the Changes in Load Energy Payment only *of the Zones* in which the net present value of the Changes in Load Energy Payment shows a decrease."[25]  Merchant Facilities are not included at all in the text

---

[24] PJM Tariff, Schedule.12(b)(v)(C) (C.A. ___-___) (emphasis added).
[25] *Id.* (emphases added).

of Schedule 12(b)(v)(C).  Merchant Facilities are not Zones under the PJM Tariff, and Schedule 12(b)(v)(C) does not mention Merchant Facilities.

The PJM Tariff provides separate and different definitions for "Zones" and "Merchant Transmission Facilities," and treats the two as separate throughout the Tariff, including in Schedule 12.[26]  The Commission admitted in the Rehearing Order that "Merchant Transmission Facilities are not technically zones."  Rehearing Order at P 29 (J.A. ___).

PJM's proposed revisions to the PJM Tariff removing the allocation for Economic Projects under Schedule 12(b)(v)(C) to Hudson—which the Commission rejected—was just and reasonable and fully consistent with the PJM Tariff and should have been accepted by the Commission.  *See* Rehearing Order at P 29 (J.A. ___) (finding "that PJM improperly removed the allocation for Economic Projects").

By contrast, when Schedule 12 provides for the allocation of costs to Merchant Facilities, it says so expressly.  That is the case for the *other two* categories of Economic Projects.  It must be presumed that the inclusion of Merchant Facilities in the PJM Tariff provisions for the first two categories of Economic Projects in

---

[26] *See, e.g.*, *id.*, Schedule 12(b)(i)(A)(1)(a) ("each Zone") (C.A. ___); *id.*, Schedule 12(b)(i)(A)(1)(b) ("Merchant Transmission Facilities") (C.A. ___); *id.*, Schedule 12(b)(iii)(A)(2) ("Zone" and "Merchant Transmission Facility") (C.A. ___); *id.*, Schedule 12(b)(iii)(A)(3) ("Merchant Transmission Facility") (C.A. ___).

Schedule 12(b)(v)(A) and 12(b)(v)(B), but not in Schedule 12(b)(v)(C), the third category of Economic Project, is intentional. *See S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 894 (D.C. Cir. 2006), *decision clarified on denial of reh'g*, 489 F.3d 1245 (D.C. Cir. 2007).

The Commission disregarded these textual differences and the intentional omission of Merchant Facilities from Schedule 12(b)(v)(C).

The Commission erroneously asserted in the Rehearing Order that, although the text of Schedule 12(b)(v)(C) "referred only to zones" and does not include Merchant Facilities, the absence of the term "Merchant Transmission Facilities" is because the addition of Schedule 12(b)(v)(C) "preceded Opinion No. 503." Rehearing Order at P 29 (J.A. ___). The genesis of Schedule 12(b)(v)(C) shows that the Commission's assertion is clearly in error. When Schedule 12(b)(v)(C) was added to the PJM Tariff, both Schedule 12(b)(V)(A) and 12(b)(v)(B) *already* existed, and *already* referenced Merchant Facilities. PJM Interconnection, L.L.C., *et al.*, Docket Nos. ER06-456-020, *et al.*, Att. B at 1 (July 28, 2009) (PJM filing adding Schedule 12(b)(v)(C), showing addition of Tariff language). The PJM filing adding Schedule 12(b)(v)(C) shows that the existing Economic Project categories already reference "Merchant Transmission Facilit[ies]," while the newly added Schedule 12(b)(v)(C) does not. *Id.* (Schedule 12(b)(v)(A)). Moreover, PJM's filing expressly states that the new Schedule 12(b)(v)(C) will allocate costs "only for those

Zones that show a decrease in Load Energy Payment[,]" and makes no reference whatsoever to allocations to Merchant Facilities. *Id.* at 3 and 4 ("Specifically, the cost responsibility will be allocated on a pro rata share to each Zone that shows a decrease in the Load Energy Payment.") (underline in original). The Commission's unsupported claim that Schedule 12(b)(v)(C) does not include the term "Merchant Facilities" because PJM did not use the term at the time Schedule 12(b)(v)(C) was added to the PJM Tariff is clear error.

It is not a reasonable interpretation of the PJM Tariff to add words that its drafters deliberately excluded, that change the effect and operation of the PJM Tariff, and that are not needed to make the PJM Tariff coherent. *Cf. GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 624-25 (7th Cir. 2013) ("A court has no right, in the guise of construction of an act, to either add words to or eliminate words from the language used by Congress." (internal quotation marks and citation omitted)). The omission of Merchant Facilities from Schedule 12(b)(v)(C) must be given effect, and the Commission's contrary conclusion was arbitrary and should be set aside.

### 2. The Commission Had No Reasoned Basis to Treat Merchant Facilities with No Firm Rights As "Load."

In its Compliance Order, the Commission also arbitrarily departed from its longstanding policy without reasoned justification by treating Hudson as "load" on the PJM system for purposes of cost responsibility for Economic Projects. The Commission found that because allocations under Schedule 12(b)(v)(C) are not

based on Merchant Facilities' Firm Rights, Merchant Facilities are "still responsible for these costs because they are still transmission owners whose load benefits from these investments."   Compliance Order at P 30 (J.A. ___).   However, because Hudson has only Non-Firm Rights, Hudson has no "load" on the PJM system.   That was the Commission's own conclusion in Opinion No. 503, where the Commission determined that Merchant Facilities with Firm Rights would be treated as load, but Merchant Facilities with Non-Firm Rights would not be treated as load.  *See* Opinion No 503 at PP 73, 79-80 (C.A. ___, C.A. ___-___).

Yet, in the orders under review, the Commission departed from this policy for Economic Projects without adequate justification.   The Commission asserted that Merchant Facilities "are still responsible for these costs because they are still transmission owners *whose load* benefits from these investments."   Compliance Order at P 30 (J.A. ___) (emphasis added).   The Commission also asserted that "the Tariff assigns these costs based on *savings to load* independent of whether the Merchant Transmission Facilities possess Firm Transmission Withdrawal Rights." Rehearing Order at P 20 (J.A. ___) (emphasis added).   Those assertions ignore that Merchant Facilities like Hudson with no Firm Rights *are not load* within PJM.

With only Non-Firm Rights, Hudson (and NYPA) are not like load in PJM. In contrast to load in PJM, PJM is not required to plan its system to accommodate Hudson's Non-Firm Rights and Hudson is not guaranteed firm service.  Therefore,

as the Commission determined for exports from PJM in Opinion No. 503, no cost responsibility should be placed on Hudson and NYPA.  The Court should find the Commission's departure from that policy here arbitrary and capricious, and set aside the orders below.

### C.    The Commission Had No Reasoned Basis for Treating Economic Projects Under Schedule 12(b)(v)(C) Like Targeted Market Efficiency Projects Under Schedule 12(b)(xvii) Despite Their Different Tariff Language.

Finally, the Commission arbitrarily found that Merchant Facilities continue to be responsible for costs associated with Economic Projects allocated under Schedule 12(b)(v)(C) based on the Commission's analogy to an entirely different type of project—Targeted Market Efficiency Projects under Schedule 12(b)(xvii). Compliance Order at P 30 (J.A. ___); Rehearing Order at PP 27, 28 (J.A. ___-___, J.A. ___).  But Economic Projects under Schedule 12(b)(v)(C) are not like Targeted Market Efficiency Projects, and the text of Schedule 12(b)(v)(C) is materially different from that of Schedule 12(b)(xvii).

The Commission's analogy to the cost allocation for Targeted Market Efficiency Projects fails because it contradicts the clear language of the PJM Tariff. Targeted Market Efficiency Projects are a different type of Regional Plan grid upgrade whose cost allocation is governed by an entirely different section of the PJM Tariff (Schedule 12(b)(xvii)) with different provisions.  As shown above, the PJM Tariff section addressing Economic Projects in Schedule 12(b)(v)(C) simply *does*

*not include* Merchant Facilities.  Unlike the other two Economic Project categories, the language in Schedule 12(b)(v)(C) allocates costs only to "Zones" and makes no reference at all to "Merchant Transmission Facilities."  In stark contrast, Schedule 12(b)(xvii) of the PJM Tariff, addressing Targeted Market Efficiency Projects, expressly makes allocations to both "Zones" *and* "Merchant Transmission Facilities."  In fact, the Targeted Market Efficiency Projects cost-allocation methodology in Schedule 12(b)(xvii) references "Merchant Transmission Facilities" *eight separate times* in a single paragraph.  There is no reasoned basis to say that the cost-allocation methodology for Economic Projects set forth in Schedule 12(b)(v)(C) of the PJM Tariff is analogous to the costs allocation methodology for Targeted Market Efficiency Projects in Schedule 12(b)(xvii) with respect to their inclusion of Merchant Facilities.  One clearly does not include Merchant Facilities, and the other, in contrast, clearly does include Merchant Facilities.

The Commission's general assertion that Economic Project cost allocations under Schedule 12(b)(v)(C) must include Merchant Facilities because it is allegedly "similar" to cost allocations for Targeted Market Efficiency Projects under Schedule 12(b)(xvii) is simply wrong.  The Commission's claim is contrary to the language of the PJM Tariff and the clear differences between the two cost allocation methodologies.

## CONCLUSION

For the foregoing reasons, the petitions for review should be granted and the

Commission's orders approving PJM's cost allocations should be vacated.

Respectfully submitted,

/s/ *Gary D. Levenson*
Gary D. Levenson
Principal Attorney
New York Power Authority
123 Main Street
White Plains, NY 10601
(518) 433-8700
Gary.Levenson@nypa.gov

/s/ *Lawrence G. Acker*
Lawrence G. Acker
Gary D. Bachman
Van Ness Feldman, LLP
1050 Thomas Jefferson St. NW
Washington DC 20007
(202) 298-1800
lga@vnf.com
gdb@vnf.com

*Counsel for New York Power Authority*

/s/ *William R. Hollaway, Ph.D.*
William R. Hollaway, Ph.D.
Lucas C. Townsend.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave, NW
Washington, DC 20036
202-955-8592
whollaway@gibsondunn.com
ltownsend@gibsondunn.com

*Counsel for Hudson Transmission Partners, LLC*

56

# ADDENDUM A

## (PJM Schedule 12 - Appendix
## Allocations to Hudson of Violation-Based Method Projects[1])

| | (1) Project No. | (2) Local Utility | (3) Description of Transmission Enhancement | (4) Share of Project Reinstated to Hudson |
|---|---|---|---|---|
| 1. | b1398.5 | ACEC | Reconductor the existing Mickleton – Gloucester 230 kV circuit (AE portion) | 0.79% |
| 2. | b1600 | ACEC | Upgrade the Mill T2 138/69 kV transformer | 0.20% |
| 3. | b2015 | JCP&L | Build a new 230 kV circuit from Larrabee to Oceanview | 1.7% |
| 4. | b1993 | MAIT, LLC for PEC Zone | Relocate the Erie South 345 kV line termina | 0.49% |
| 5. | b1994 | MAIT, LLC for PEC Zone | Convert Lewis Run-Farmers Valley to 230 kV using 1033.5 ACSR conductor. Project to be completed in conjunction with new Farmers Valley 345/230 kV transformation | 0.44% |
| 6. | b1178 | PECO | Add a second 230/138 kV transformer at Chichester. Add an inductor in series with the parallel transformers | 0.32% |
| 7. | b1182 | PECO | Reconductor Chichester – Saville 138 kV line and upgrade terminal equipment | 0.38% |
| 8. | b1398.6 | PECO | Reconductor Chichester – Saville 138 kV line and upgrade terminal equipment | 0.79% |
| 9. | b1398.8 | PECO | Reconductor Richmond – Waneeta 230 kV and replace terminal equipment at Richmond and Waneeta substations | 0.79% |

---

[1] Information in columns (1) – (4) copied from PJM Compliance Filing, Schedule 12-Appendix, Docket No. ER18-680-000 (filed Jan. 19, 2018) (R.2; J.A. ___-___) (identifying projects and allocation percentages for Hudson that PJM requested to be deleted to comply with the Commission's December 15, 2017 order granting Hudson's relinquishment of Firm Rights, but reinstated by the March 31, 2020 Compliance Order).

| | (1) Project No. | (2) Local Utility | (3) Description of Transmission Enhancement | (4) Share of Project Reinstated to Hudson |
|---|---|---|---|---|
| **10.** | b1590.1 | PECO | Upgrade the PECO portion of the Camden – Richmond 230 kV to a six wire conductor and replace terminal equipment at Richmond | 0.21% |
| **11.** | b1591 | PECO | Reconductor the underground portion of the Richmond – Waneeta 230 kV and replace terminal equipment | 0.03% |
| **12.** | b1717 | PECO | Install a second Waneeta 230/138 kV transformer on a separate bus section | 0.04% |
| **13.** | b1900 | PECO | Add a 3rd 230 kV transmission line between Chichester and Linwood substations and remove the Linwood SPS | 0.43% |
| **14.** | b2140 | PPL | Install a 3rd Emilie 230/138 kV transformer | 1.34% |
| **15.** | b2006 | PEPCO | Install North Lancaster 500/230 kV substation (below 500 kV portion) | 0.37% |
| **16.** | b1592 | PEPCO | Reconductor the Oak Grove – Bowie 230 kV circuit and upgrade terminal equipment at Oak Grove and Bowie 230 kV substations | 0.10% |
| **17.** | b1593 | PEPCO | Reconductor the Bowie - Burtonsville 230 kV circuit and upgrade terminal equipment at Bowie and Burtonsville 230 kV substations | 0.10% |
| **18.** | b1594 | PEPCO | Reconductor the Oak Grove – Bowie 230 kV '23042' circuit and upgrade terminal equipment at Oak Grove and Bowie 230 kV substations | 0.10% |
| **19.** | b1595 | PEPCO | Reconductor the Bowie – Burtonsville 230 kV '23042' circuit and upgrade terminal equipment at Oak Grove and Burtonsville 230 kV substations | 0.10% |
| **20.** | b1223 | PSEG | Re-configure the Lawrence 230 kV substation to breaker and half | 0.14% |
| **21.** | b1304.1 | PSEG | Convert the existing 'D1304' and 'G1307' 138 kV circuits between Roseland – Kearny – Hudson to 230 | 16.05% |

A-2

| | (1) Project No. | (2) Local Utility | (3) Description of Transmission Enhancement | (4) Share of Project Reinstated to Hudson |
|---|---|---|---|---|
| | | | kV operation **(a.k.a Northeast Grid Reliability Project)** | |
| **22.** | b1304.2 | PSEG | Expand existing Bergen 230 kV substation and reconfigure the Athenia 230 kV substation to breaker and a half scheme **(a.k.a Northeast Grid Reliability Project)** | 16.05% |
| **23.** | b.1304.3 | PSEG | Build second 230 kV underground cable from Bergen to Athenia **(a.k.a Northeast Grid Reliability Project)** | 16.05% |
| **24.** | b1304.4 | PSEG | Build second 230 kV underground cable from Hudson to South Waterfront **(a.k.a Northeast Grid Reliability Project)** | 16.05% |
| **25.** | b.1398 | PSEG | Build two new parallel underground circuits from Gloucester to Camden | 0.79% |
| **26.** | b1398.1 | PSEG | Install shunt reactor at Gloucester to offset cable charging | 0.79% |
| **27.** | b1398.2 | PSEG | Reconfigure the Cuthbert station to breaker and a half scheme | 0.79% |
| **28.** | b1398.3 | PSEG | Build a second 230 kV parallel overhead circuit from Mickelton–Gloucester | 0.79% |
| **29.** | b1398.4 | PSEG | Reconductor the existing Mickleton – Gloucester 230 kV circuit (PSEG portion) | 0.79% |
| **30.** | b1398.7 | PSEG | Reconductor the Camden – Richmond 230 kV circuit (PSEG portion) and upgrade terminal equipment at Camden substations | 0.79% |
| **31.** | b1588 | PSEG | Reconductor the Eagle Point - Gloucester 230 kV circuit #1 and #2 with higher conductor rating | 0.75% |
| **32.** | b1589 | PSEG | Re-configure the Kearny 230 kV substation and loop the P-2216-1 (Essex - NJT Meadows) 230 kV circuit | 20.18% |
| **33.** | b1590 | PSEG | Upgrade the PSEG portion of the Camden Richmond 230 kV circuit to | 0.21% |

|  | (1) Project No. | (2) Local Utility | (3) Description of Transmission Enhancement | (4) Share of Project Reinstated to Hudson |
|---|---|---|---|---|
|  |  |  | six wire conductor and replace terminal equipment at Camden |  |
| **34.** | b1787 | PSEG | Build a second 230 kV circuit from Cox's Corner - Lumberton | 0.15% |
| **35.** | b2159 | PSEG | Reconfigure the Linden, Bayway, North Ave, and Passaic Valley S.C. 138 kV substations.  Construct and loop new 138 kV circuit to new airport station | 24.49% |
| **36.** | b1773 | ComEd | Reconductor approximately 12.51 miles of East Frankfort - Crete 345 kV line 6607. Same as n2089 | 0.25% |
| **37.** | b1774 | ComEd | Reconductor approximately 11.75 miles of Crete - St. John 345 kV. Same as n2088 | 0.24% |
| **38.** | b1774.1 | ComEd | Reconductor approximately 1 mile of Crete - St. John 345 kV in NIPS/MISO. Same as n2088 | 0.24% |
| **39.** | b1465.1 | AEP | Add a 3rd 2250 MVA 765/345 kV transformer at Sullivan station | 0.07% |
| **40.** | b1495 | AEP | Add an additional 765/345 kV transformer at Baker Station | 0.04% |
| **41.** | b1659 | AEP | Establish Sorenson 345/138 kV station as a 765/345 kV station | 0.03% |
| **42.** | b1957 | AEP | Terminate Transformer #2 at SW Lima in a new bay position | 0.19% |
| **43.** | b1970 | AEP | Reconductor 13 miles of the Kammer – West Bellaire 345kV circuit | 0.11% |
| **44.** | b2017 | AEP | Reconductor or rebuild Sporn - Waterford - Muskingum River 345 kV line | 0.09% |
| **45.** | b1976 | ATSI | Reconductor ATSI portion of South Canton – Harmon 345 kV line | 0.14% |

A-4

# ADDENDUM B

## (PJM Schedule 12 – Appendix A
## Allocations to Hudson of Economic Projects[1])

| | (1) Project No. | (2) Local Utility | (3) Description of Transmission Enhancement | (4) Share of Project Reinstated to Hudson |
|---|---|---|---|---|
| 1. | b2766.1 | BGE | Upgrade substation equipment at Conastone 500 kV to increase facility rating to 2826 MVA normal and 3525 MVA emergency | 1.10% |
| 2. | b2694 | PECO | Increase ratings of Peach Bottom 500/230 kV transformer to 1479 MVA normal/1839 MVA emergency | 0.96% |
| 3. | b2766.2 | PECO | Upgrade substation equipment at Peach Bottom 500 kV to increase facility rating to 2826 MVA normal and 3525 MVA emergency | 1.10% |
| 4. | b2218 | PSEG | Rebuild 4 miles of overhead line from Edison - Meadow Rd - Metuchen (Q 1317) | 36.49% |
| 5. | b2692.1 | ComEd | Replace station equipment at Nelson, ESS H-471 and Quad Cities | 0.05% |
| 6. | b2692.2 | ComEd | Upgrade conductor ratings of Cordova – Nelson, Quad Cities – ESS H-471 and ESS H-471 – Nelson 345 kV lines and mitigating sag limitations | 0.05% |
| 7. | b2689.1 | Duquesne | Reconductor approximately 7 miles of the Woodville – Peters (Z-117) 138 kV circuit | 0.04% |

[1] Information in columns (1) – (4) copied from PJM Compliance Filing, Schedule 12-Appendix A, Docket No. ER18-680-000 (filed Jan. 19, 2018) (R.2; J.A. ___-___) (identifying projects and allocation percentages for Hudson that PJM requested to be deleted to comply with the Commission's December 15, 2017 order granting Hudson's relinquishment of Firm Rights, but reinstated by the March 31, 2020 Compliance Order).

| | (1) Project No. | (2) Local Utility | (3) Description of Transmission Enhancement | (4) Share of Project Reinstated to Hudson |
|---|---|---|---|---|
| **8.** | b2689.2 | Duquesne | Reconfigure West Mifflin-USS Clairton (Z-15) 138 kV circuit to establish Dravosburg-USS Clairton (Z-14) 138 kV circuit and West Mifflin-Wilson (Z-15) 138 kV circuit | 0.04% |
| **9.** | b2729 | VEPCO | Optimal Capacitors Configuration: New 175 MVAR capacitor at Brambleton, new 175 MVAR capacitor at Ashburn, new 300 MVAR capacitor at Shelhorm, new 150 MVAR capacitor at Liberty | 0.34% |

B-2

**STATUTORY ADDENDUM**

# Table of Contents to Statutory Addendum

Administrative Procedures Act
    5 U.S.C. § 706(2) ................................................................................... S-1

Federal Power Act
    16 U.S.C. § 824d ................................................................................. S-2
    16 U.S.C. § 825*l* ................................................................................. S-6

## 5 U.S.C. § 706
## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**16 U.S.C. § 824d**

### § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow

changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

**(1)** Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine--

**(A)** whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

**(B)** whether any such clause reflects any costs other than costs which are--

**(i)** subject to periodic fluctuations and

**(ii)** not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

**(2)** Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

**(3)** The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to--

**(A)** modify the terms and provisions of any automatic adjustment clause, or

**(B)** cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

**(4)** As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum--

**(A)** the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

**(B)** each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

## 16 U.S.C.A. § 825*l*
### § 825*l*. Review of orders

**(a) Application for rehearing; time periods; modification of order**

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by FERC in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application FERC shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless FERC acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of FERC shall be brought by any entity unless such entity shall have made application to FERC for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), FERC may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Judicial review**

Any party to a proceeding under this chapter aggrieved by an order issued by FERC in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of FERC upon the application for rehearing, a written petition praying that the order of FERC be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of FERC and thereupon FERC shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of FERC shall be considered by the court unless such objection shall have been urged before FERC in the application for rehearing unless there is reasonable ground for failure so to do. The finding of FERC as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction

of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before FERC, the court may order such additional evidence to be taken before FERC and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. FERC may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of FERC, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by FERC, operate as a stay of FERC's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of FERC's order.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This brief complies with the type-volume requirement of this Court's November 18, 2022 Order, because this brief contains 12,434 words, as determined by the word-count function of Microsoft Word 2019, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

Dated:  February 17, 2023                    Respectfully submitted,

                                             */s/ Lawrence G. Acker*
                                             Lawrence G. Acker
                                             VAN NESS FELDMAN LLP
                                             1050 Thomas Jefferson St. NW
                                             Washington DC
                                             (202) 298- 1800
                                             lga@ vnf.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2023, I caused a true and correct copy of this brief to be electronically filed through the Court's CM/ECF system, which will send a notice of filing to all registered users.

Dated:  February 17, 2023          Respectfully submitted,

_/s/ Lawrence G. Acker_
Lawrence G. Acker
VAN NESS FELDMAN LLP
1050 Thomas Jefferson St. NW
Washington DC
(202) 298- 1800
lga@ vnf.com